# No.14-1752

## In the United States Court of Appeals for the Second Circuit



PAUL D. CEGLIA,

*Plaintiff-Appellant,*

- V -

ERIC H. HOLDER, JR., as Attorney General of the United States, PREETINDER S. BHARARA, as U.S. Attorney for the Southern District of New York, JANIS M. ECHENBERG, as representative of the U.S. Attorney's Office for the Southern District of New York, CHRISTOPHER D. FRYE, as representative of the U.S. Attorney's Office for the Southern District of New York,

*Defendants-Appellees.*

―――――――――――――――――

On Appeal from the United States District Court for the Western District of New York (Buffalo), District Court No. 13-cv-256

## Appellant's Brief and Special Appendix

JOSEPH M. ALIOTO
  COUNSEL OF RECORD
ALIOTO LAW FIRM
ONE SANSOME STREET, 35TH FLOOR
SAN FRANCISCO, CA 94104
(415) 434-8900

GIL D. MESSINA
MESSINA LAW FIRM, P.C.
961 HOLMDEL ROAD
HOLMDEL, NJ 07733
(732) 332-9300

*COUNSEL FOR PLAINTIFF-APPELLANT*

SUPREME COURT PRESS    ♦    (888) 958-5705    ♦    BOSTON, MASSACHUSETTS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................ iv

JURISDICTIONAL STATEMENT. ..................................... 1

STATEMENT OF THE ISSUE.......................................... 1

STATEMENT OF THE CASE. .......................................... 1

    A.  The Relevant Procedural History and the Rulings Presented for
Review............................................................. 1

    B.  Facts Relevant to the Issue Presented for Review. ................. 4

SUMMARY OF THE ARGUMENT. .................................... 9

ARGUMENT...................................................... 11

    A.  The District Court Erred When it Denied Plaintiff's Motion for a
Preliminary Injunction Wherein He Sought to Enjoin Defendants from
Prosecuting Him for Mail and Wire Fraud Because He Had Filed and
Served Litigation Documents in an Underlying Civil Action and
When the Court Dismissed His Complaint under Federal Rule of Civil
Procedure 12(b)(6)............................................... 11

        i.  The District Court Had the Authority to Enjoin
Plaintiff's Criminal Prosecution. ............................ 11

        ii.  Plaintiff's Right to Access the Courts is Protected by
First Amendment and Defendants Have Infringed That
Right. ..................................................... 16

        iii.  The Plaintiff's Civil Action had Noerr-Pennington
Immunity Because it is Not Objectively Baseless................ 17

iv.  The Evidence in the Record of this Case Underscores
the Fact that the Civil Action is *Not* Objecively Baseless.......... 23

    a.  The Report of John W. Cawley, III Does
    *Not* Opine That the Work for Hire
    Document is Not Authentic........................... 24

    b.  Katherine Koppenhaver's Report
    Thoroughly Discredited the Cawley Report
    and Established the Work for Hire
    Contract's Authenticity............................... 25

    c.  Joan Winkelman's Report Also Attested
    to the Authenticity of the Work for Hire
    Contract........................................... 28

v.  The District Court Erred When it Dismissed
Plaintiff's Complaint Under Red. R. Civ. P. 12(b)(6)............. 30

B.  A Strong Basis Exists for Issuing an Injunction to Halt the
Prosecution of Plaintiff........................................... 31

i.  Plaintiff has a High Likelihood of Succeeding on the
Merits. ...................................................... 32

    a.  The Judicial Function Exception
    Immunizes Plaintiff from Prosecution for
    Filing and Serving Documents in the Civil
    Action........................................... 34

    b.  As a Matter of Law, Plaintiff's Filing
    and Serving Papers Which Zuckerberg
    Swore He Knew to be False and Plaintiff's
    Engagement in the Ordinary Litigation
    Practices of Filing and Serving Those
    Papers, Cannot be the Subject of
    Prosecution for Mail and Wire Fraud Under
    Long-standing Precedent From the Federal
    Courts........................................... 38

ii.   Plaintiff has Suffered Irreparable Harm and Lacks An
Adequate Remedy at Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

iii.   Balancing the Equities Strongly Favors Issuing an
Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

iv.   The Public Interest Will Not be Harmed by Issuing
an Injunction, but Will be Significantly Benefited
Thereby. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

## TABLE OF AUTHORITIES

### Cases

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*,
    263 F.3d 239 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Alliance For Open Soc'y Int'l Inc. v. United States Agency*
    *For Int'l Dev.*, 651 F.3d 218 (2nd Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 33

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Amoco Production Co. v. Gambell*, 480 U.S. 531 (1987). . . . . . . . . . . . . . . . . . . 31

*Baggett v. Bullitt,* 377 U.S. 360 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516 (2002). . . . . . . . . . . . . . . . . . . . . . . 17

*Berger v. United States,* 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983). . . . . . . . . . . . . . 16

*Brewer v. West Irondequoit Cent. School Dist.*, 212 F.3d 738
    (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Bronston v. United States*, 409 U.S. 352 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Bush v. Orleans School Board,* 194 F. Supp. 182, affirmed
    *sub nom. Tugwell v. Bush,* 367 U.S. 907 (1961). . . . . . . . . . . . . . . . . . . . . 13

*California Pharmacy Management v. Zenith Ins.*, 669 F. Supp. 2d
    1152 (C.D. Cal. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 48

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ceglia v. Zuckerberg, et al.*, civil no. 1:10-cv-00569 (W.D.N.Y.). . . . . . 2, 4, 22, 39

*Ceglia v. Zuckerberg, et al.*, docket no. 14-1365.......................... 3, 21

*Ceglia v. Zuckerberg,* 2013 U.S. Dist. LEXIS 45500
    (W.D.N.Y. March 26, 2013). .................................... 3, 20

*Chambers v. Baltimore & Ohio R. Co.*, 207 U.S. 142 (1907)................. 17

*Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir.),
    cert. denied, 528 U.S. 871 (1999). ................................. 18

*Chevron USA Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984). ............................................ 33

*Christoforu v. United States*, 842 F. Supp. 1453 (S.D. Fla. 1994). ........... 15

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
    499 U.S. 365 (1991). ........................................... 19

*Cityfed Financial v. Office of Thrift Supervision*, 58 F. 3d 738
    (D.C. Cir. 1995)................................................ 31

*Clarke v. Office of Fed. House. Enter. Oversight*, 355 F. Supp. 2d
    56 (D.D.C. 2004)............................................... 54

*Curtis & Associates v. Law Offices of Bushman*, 758 F. Supp. 2d
    153 (E.D. N.Y. 2010), *aff'd* by Summary Order, 443 Fed.
    Appx. 582; 2011 U.S. App. LEXIS 20778 (2d Cir. 2011). .......... 43, 49

*Daddona v. Gaudio*, 156 F. Supp. 2d 153 (D. Conn. 2000). .............. 43, 48

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)............. 11, 12, 13, 14, 50, 54

*Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839
    (N.D. Ill. 2013)............................................ 43, 47, 48

*Eastern Railroad Presidents Conference v. Noerr Motor
    Freight, Inc.,* 365 U.S. 127 (1961). ......................... 17, 18, 34

*eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). . . . . . . . . . . . . . . . . . . 32

*Elrod v. Burns*, 427 U.S. 347 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Fenner v. Boykin*, 271 U.S. 240 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gremillion v. United States,* 368 U.S. 11 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hallmark Cards, Inc. v. Monitor Clipper Partners*,
    757 F. Supp. 2d 904 (W.D. Mo. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 43, 49

*Juluke v. Hodel,* 811 F. 2d 1553 (D.C. Cir.1987). . . . . . . . . . . . . . . . . . . . . . . . . 15

*Krizek v. CIGNA Group Ins.*, 345 F.3d 91 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . 11

*Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*,
    257 F. Supp. 2d 819 (M.D. La. 2002). . . . . . . . . . . . . . . . . . . . . . 42, 46, 47

*Majuri v. United States*, 431 F.2d 469 (3d Cir.), cert. denied,
    400 U.S. 943  (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McDonald v. Smith*, 472 U.S. 479 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Morgan v. United States*, 309 F.2d 234 (D.C. Cir. 1962). . . . . . . . . . . . . . . . . . . . . 36

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir.1998). . . . . . . . . . . . . . . . 54

*Munaf v. Geren*, 553 U.S. 674 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*NAACP v. Button,* 371 U.S. 415 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 54

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82 (5th Cir. 1992). . . . . . . . . . . . . . 54

*Nolan v. Galaxy Scientific Corp.*, 269 F. Supp. 2d 635
    (E.D. Pa. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 48

*Norton v. United States*, 92 F.2d 753 (9th Cir.1937). . . . . . . . . . . . . . . . . . . . . . . 45

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123
    (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures
    Indus., Inc.*, 508 U.S. 49 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002). . . . . . . . . . . . . . . . 11

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sosa v. DirecTV, Inc.*, 437 F.3d 923 (9th Cir. 2006). . . . . . . . . . . . . . 18, 19, 42, 46

*Talley v. Halpern*, 2005 U.S. Dist. LEXIS 17423 (E.D. Pa. 2005). . . . . . . . . 43, 49

*Thomas v. Collins*, 323 U.S. 516 (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tradecomet.Com LLC v. Google, Inc.*, 647 F.3d 472 (2d Cir. 2011). . . . . . . . . . 11

*United Mine Workers v. Illinois Ba r Assn.,* 389 U.S. 217 (1967). . . . . . . . . . 12, 17

*United Mine Workers v. Pennington,* 381 U.S. 657 (1965). . . . . . . . . . . . . . . 17, 18

*United States v. Bramblett*, 348 U.S. 503 (1955). . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Butler*, 351 F. Supp. 2d 121 (S.D.N.Y. 2004). . . . . . . . . . . . 38, 52

*United States v. Ceglia,* 1:12-cr-876 (S.D.N.Y.). . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*United States v. Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1876). . . . . . . . . . . . . 17

*United States v. D'Amato*, 507 F.2d 26 (2d Cir.1974). . . . . . . . . . . . . . . . . . . . . 37

*United States v. Horvath*, 492 F.3d 1075 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . 36

*United States v. Masterpol*, 940 F.2d 760 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . 37

*United States v. McNeil*, 362 F.3d 570 (9th Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002). . . . . . . 10, 40, 42-49

*United States v. Vreeland*, 684 F.3d 653 (6th Cir. 2012).. . . . . . . . . . . . . . . 34, 37

*Warnock v. State Farm Mut. Auto. Ins. Co.*, 833 F. Supp. 2d
    604 (S.D. Miss. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 48

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982).. . . . . . . . . . . . . . . . . . . . 31

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Younger v. Harris*, 401 U.S. 37 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## <u>Constitution</u>

Article III. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Seventh Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## <u>Statutes</u>

18 U.S.C. § 1001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35, 36, 37

18 U.S.C. § 1001(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 34, 35, 36, 38

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 38, 39, 42, 44, 45

18 U.S.C. § 1343. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 38, 39, 42, 45

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## **Acts**

H. R. Rep. No. 104-680, 104th Cong., 2nd Sess. 1996,
    as reprinted, 1996 U.S.C.C.A.N. 3935. . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## **Rules**

Federal Rule of Civil Procedure 12(b)(6). . . . . . . . . . . . . . . . . . 1, 10, 11, 29, 30, 32

## **Miscellaneous Authorities**

A.B.A. Model Code of Professional Responsibility Rule 7-105(A). . . . . . . . . . . 54

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331, because the matter in controversy is a civil action that arises under the Constitution and laws of the United States.

The Court of Appeals has jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final decision of the District Court for the Western District of New York.

The appeal is timely because the final judgment was entered on March 26, 2014, the defendants are named in their capacity as officers of the United States, and the Notice of Appeal was filed on May 21, 2014.

## STATEMENT OF THE ISSUE

Whether the District Court erred when it denied plaintiff's motion for a preliminary injunction wherein he sought to enjoin defendants from prosecuting him for mail and wire fraud because he had filed and served litigation documents in an underlying civil action and when it dismissed his complaint under Federal Rule of Civil Procedure 12(b)(6).

## STATEMENT OF THE CASE

### A.   The Relevant Procedural History and the Rulings Presented for Review

This lawsuit was brought against representatives of the U.S. Department of Justice seeking to enjoin the Government's criminal prosecution of plaintiff Paul

Ceglia.  (A-83, 315).[1]/

Ceglia was charged with wire fraud and mail fraud for filing and serving litigation documents, electronically and through the mails, in his civil action in the Western District of New York, entitled *Ceglia v. Zuckerberg, et al.*, civil no. 1:10-cv-00569 ("the Civil Action").  (SA-1; A-344).  The prosecution was intended to chill Ceglia's exercise of his First Amendment right to petition the courts in the Civil Action and to chill his attorneys' efforts to litigate the Civil Action on his behalf by placing them under a similar threat of prosecution.  (A-326-327 (¶¶ 52-55).  Plaintiff alleged an improper relationship between the U.S. Attorney and the attorneys for Zuckerberg and Facebook in the Civil Action and that the prosecution has employed the prosecutorial powers of the United States government to affect the outcome of the Civil Action for the benefit of Zuckerberg and Facebook.  (A-320-321, ¶¶ 24-28).

This appeal seeks the reversal of the District Court's Order and Judgment denying the preliminary injunction and dismissing this case, which was entered by the Honorable Richard J. Arcara.  (SA-10 and 13).

Ceglia's Civil Action against Zuckerberg and Facebook was dismissed by the District Court after the District Judge accepted the Report and

---

[1] "A" refers to the Joint Appendix and "SA" to the Special Appendix.

2

Recommendation ("R&R") of the Magistrate Judge in that case and granted the

defendants' Motion to Dismiss for Fraud Upon the Court.  The R&R is reported at

*Ceglia v. Zuckerberg,* 2013 U.S. Dist. LEXIS 45500 (W.D.N.Y. March 26, 2013).

In so doing, the Magistrate erred by admittedly considering the evidence most

favorable to the defendants and acting as the finder of fact in the face of strong,

countervailing evidence by plaintiff.  According to the Magistrate, because he had

found for the defendants, there was not a case or controversy and he lacked subject

matter jurisdiction under Article III of the Constitution.  The Magistrate then

proceeded to also recommend dismissal of the Civil Action on the alternative

ground that Ceglia had spoliated evidence.  The District Judge's acceptance of the

Magistrate's R&R and his order and judgment dismissing the Civil Action are

currently before this Court in the related appeal, *Ceglia v. Zuckerberg*, *et al.*,

docket no. 14-1365.

Having accepted the Magistrate's R&R, the District Judge then immediately

dismissed this injunction case on the ground the original Civil Action was sham

litigation for which Ceglia did not have First or Seventh Amendment (SA-17, 18)

protection (SA-10), notwithstanding the convincing expert reports supporting

Ceglia's contentions in both the Civil Action and this injunction case.  (A-358-372

and A-373-401).

3

This appeal seeks the reversal of the grant of the District Court's Order and Judgment denying the preliminary injunction and dismissing this case.

The Civil Action appeal and the appeal in this case have each been identified as related actions in the two appeals now pending in this Court.

### B.   Facts Relevant to the Issue Presented for Review

In June 2010, plaintiff-appellant, Paul Ceglia ("plaintiff" or "Ceglia"), filed the Civil Action against Mark Zuckerberg ("Zuckerberg") and Facebook, Inc. ("Facebook") in the Supreme Court for the State of New York, Allegany County ("Civil Action").  Upon the defendants' motion, that case was removed to the United States District Court for the Western District of New York.  (See, *Ceglia v. Zuckerberg, et al.*, 10-cv-569 (RJA)(LGF)).

Subsequently, on October 26, 2012, plaintiff was arrested pursuant to a criminal complaint filed in the Southern District of New York.

On November 26, 2012, a federal grand jury empaneled in the Southern District of New York returned a two count indictment under case number 1:12-cr-876 (ALC) (the "Indictment") charging Ceglia with one count of mail fraud in violation of 18 U.S.C. §1341, and one count of wire fraud in violation of 18 U.S.C. §1343 for filing and serving litigation documents in connection with the Civil Action.

4

In the Civil Action, Ceglia claims that on April 28, 2003, he and Zuckerberg entered into a "Work for Hire Contract," pursuant to which Ceglia would receive one-half of "the software, programming language and business interests derived from the expansion of the service to a larger audience," the service being identified interchangeably in the contract as "The Face Book" or "The Page Book." (See Work for Hire Contract at A-245-246). Although Zuckerberg admits having entered an agreement with Ceglia on the same date, he denied that the Work for Hire Contract is that agreement. (A-242). As discussed below, there is strong evidence that the Work for Hire Contract is the authentic contract between the two and plaintiff cannot, therefore, be criminally prosecuted for having brought a lawsuit to enforce it.

The allegations contained in Count 1 of the Indictment relative to mail fraud are as follows:

> to wit, Ceglia filed a civil lawsuit against Facebook, Inc. and that company's founder and Chief Executive Officer, Mark Zuckerberg, fraudulently demanding a significant ownership stake in Facebook, Inc., and caused legal pleadings and other items to be delivered by mail to Washington, D.C., among other places, from the Southern District of New York and elsewhere, including on or about April 11, 2011. [*April 11, 2011 is the filing date of plaintiff's amended complaint in the Civil Action*].

(SA-4).

5

The allegations contained in Count 2 of the Indictment relative to wire fraud substantially mirror the mail fraud allegations of Count 1, and reads as follows:

> to wit, Ceglia filed a civil lawsuit against Facebook, Inc. and that company's founder and Chief Executive Officer, Mark Zuckerberg, fraudulently demanding a significant ownership stake in Facebook, Inc., and caused others to send interstate electronic communications in connection with that lawsuit, including on or about July 14, 2011, November 1, 2011 and December 8, 2011.  [*These are dates of plaintiff's electronic filings in the underlying Civil Action*].

(SA-5).

The Indictment brought in the Southern District of New York contains no allegations of illegal conduct attributable to plaintiff other than that he filed the Civil Action in the Western District of New York and engaged in the ordinary litigation activities of filing and serving documents.  However, in an extrajudicial statement given to the public media, U.S. Attorney Preetinder S. Bharara stated that the criminal conduct attributed to plaintiff was "dressing up a fraud as a lawsuit."  (See, THE NEW YORK TIMES, "Man Claiming Facebook Ownership Arrested on Fraud Charges," by Peter Lattman, October 26, 2012, 2:44 pm).  (A-108-110).

In the Government's response to plaintiff's motion to change venue, the Government stated that every future filing made by or on behalf of plaintiff in the Civil Action will be subject to criminal prosecution on the same charges as those

brought in the Indictment.  (Motion for Expedited Hearing on Motion for TRO (Doc. 3, Exhibit B, p.11-12).[2]/  Defendants' position is that every time counsel for the plaintiff in the underlying Civil Action sends, and defendants' counsel in that case receives, electronic communications from the Court presiding over the Civil Action, or from plaintiff's attorneys directly, it is an affirmative act in furtherance of "an ongoing fraud."  (*Id.* at p.3 and Hearing Transcript (May 10, 2013) A-288, T.14:23-15:21).

Plaintiff alleges that the Government, in commencing and continuing the criminal prosecution of the plaintiff for exercising his First Amendment right to petition for redress of grievances has intended to interfere with the jurisdiction of the Court in the Western District of New York to hear the Civil Action and has chilled plaintiff's exercise of his constitutional right to proceed in that action (A-326-327, ¶¶ 49-55).

Consequently, Ceglia brought an action to restrain and enjoin the Government from continuing to violate his First Amendment rights; specifically, to discontinue criminal prosecution of him in the criminal action *United States v. Ceglia*, 12-cr-876 (S.D.N.Y.).  (A-83, 315).  In addition, plaintiff sought to enjoin the defendants from acting upon and completing their threats to commence new

---

[2] The Government's Memorandum was filed in this action as an exhibit and appears as Doc. 3, Exhibit B in the record.

and separate criminal proceedings against plaintiff, should he, directly or indirectly, engage in the filing or service of future pleadings or filings in the underlying Civil Action.

Plaintiff asserts, that in the face of defendants' conduct, a private citizen must now forego seeking redress of a good faith, legitimate grievance in court, or run the considerable risk of being indicted by the Government merely for filing and serving civil litigation documents.  (A-326-327, ¶ 53).

Plaintiff will show that, based upon settled principles of Federal statutory and case law, the prosecution of plaintiff for mail and wire fraud for pursuing civil litigation is impermissible on its face, is doomed to fail as a matter of law and must be enjoined to abate the continuing violation of plaintiff's constitutional rights.

At present, plaintiff, by reason of the criminal prosecution, has been ordered to live under home detention with a GPS ankle bracelet.  Additionally, plaintiff lives under the constant threat of further prosecution, fear of possible revocation of bail, and the filing of *additional* federal charges against him simply for proceeding with, and actively prosecuting the Civil Action, including pursuing the appeal of that case in this Court.  Thus, the grant of plaintiff's motion for an injunction is essential to restore to him his First Amendment right to petition.

8

Plaintiff respectfully requests that this Court reverse the District Court's Order which denied him injunctive relief and dismissed his Complaint against the defendants on the ground his underlying Civil Action was a sham which is not protected by the First Amendment. Plaintiff respectfully requests that this Court, upon *de novo* review, grant plaintiff's motion for injunctive and declaratory relief and enjoin the criminal prosecution commenced against him on November 26, 2012, in the Southern District of New York on the basis that it may not proceed, as a matter of law.

## SUMMARY OF THE ARGUMENT

The plaintiff, Paul Ceglia, was indicted and is being prosecuted for mail and wire fraud by the United States Attorney for the Southern District of New York because Ceglia filed a Civil Action in the United States District Court for the Western District of New York against Mark Zuckerberg and Facebook seeking to enforce a written contract which he and Zuckerberg entered into on April 28, 2003. Because the Government contends that the contract and other documents upon which Ceglia relies in the Civil Action are fraudulent, he has been charged with mail and wire fraud for filing and serving litigation documents in the Civil Action.

The Indictment and prosecution of Ceglia is a patent violation of his constitutional right to petition under the First Amendment by filing the Civil

Action.  Plaintiff's prosecution by the defendants is prohibited by 18 U.S.C. §
1001(b), also called the Judicial Function Exception, and by the long line of cases
exemplified by the decision in *United States v. Pendergraft*, 297 F.3d 1198, 1209
(11th Cir. 2002), which clearly prohibits prosecuting a person for wire or mail
fraud under the facts of the instant case.

Plaintiff more than satisfied the burden entitling him to an injunction to halt
his prosecution and the District Court erred when it denied his Motion for a
Preliminary Injunction.  The District Court also erred when it dismissed his
complaint seeking injunctive relief under Fed. R. Civ. P. 12(b)(6) solely on the
ground the underlying Civil Action against Zuckerberg and Facebook was
(erroneously) dismissed.

Plaintiff seeks the reversal of the District Court's Order denying him an
injunction and dismissing his complaint and seeks an Order from this Court for the
entry of an injunction to halt his criminal prosecution or a remand to the District
Court directing that court to enter such an injunction.

# ARGUMENT

## A.   The District Court Erred When it Denied Plaintiff's Motion for a Preliminary Injunction Wherein He Sought to Enjoin Defendants from Prosecuting Him for Mail and Wire Fraud Because He Had Filed and Served Litigation Documents in an Underlying Civil Action, and When the Court Dismissed His Complaint under Federal Rule of Civil Procedure 12(b)(6)

Review of the District Court's Order and Judgment of dismissal under Fed. R. Civ. P. 12(b)(6) is *de novo*, viewing all facts in the light most favorable to the non-moving party.  *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *Tradecomet.Com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011).  Similarly, review of the misapplication of the law and resultant dismissal are *de novo.*  *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 87 (2d Cir. 2002); *Tradecomet.com, LLC v. Google, Inc., supra*.  Finally, an appellate court reviews *de novo* a district court's conclusions of law and mixed questions of law and fact.  *Krizek v. CIGNA Group Ins.*, 345 F.3d 91, 99 (2d Cir. 2003).

### i.   The District Court Had the Authority to Enjoin Plaintiff's Criminal Prosecution

The District Court had the authority to enjoin the ongoing and threatened criminal prosecution of plaintiff.  Courts normally refrain from enjoining ongoing criminal prosecutions as "[i]t is generally to be assumed that ... prosecutors will observe constitutional limitations as expounded by this Court."  *Dombrowski v.*

*Pfister*, 380 U.S. 479, 484 (1965). This common sense assumption underlies the general rule. However, the exception to this rule applies where, as here, a prosecution improperly encroaches upon First Amendment rights. "[A]ctivities protected by the first amendment are a common basis for injunctive relief against actual or threatened criminal prosecution ... ." *Majuri v. United States*, 431 F.2d 469, 473 (3d Cir.), cert. denied, 400 U.S. 943 (1970). An injunction ensures immediate relief from the deprivation of constitutional rights. "The First Amendment would ... be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed that prohibits free speech, press, petition, or assembly as such." *United Mine Workers v. Illinois Bar Assn.,* 389 U.S. 217, 222 (1967).

The Supreme Court addressed this critical need for intervention directly. The Court found a statute violated the First Amendment because it was impermissibly vague. The Court reasoned that:

> [w]hen the statutes also have an overbroad sweep, as is here alleged, the hazard of loss or substantial impairment of those precious rights may be critical. For in such cases, the statutes lend themselves too readily to denial of those rights. The assumption that defense of a criminal prosecution will generally assure ample vindication of constitutional rights is unfounded in such cases.

*Dombrowski v. Pfister*, 380 U.S. at 486 (citing *Baggett v. Bullitt,* 377 U.S. 360, 379 (1964)).

12

Plaintiff asserts that the Government's invocation of the mail and wire fraud statutes against plaintiff, as set out in the Indictment, mandated immediate relief. An injunction is the equitable intervention that restores the injured party's rights and ends the deprivation. Without equitable intervention, plaintiff has been – and a large class of civil litigants will also be – deprived of First Amendment rights or chilled when exercising them.  To be sure, the Supreme Court has consistently held that,

> [t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure.  See, *NAACP v. Button,* [371 U.S. 415,] 432-433 [(1963)]; *cf. Baggett v. Bullitt, supra,* at 378-379; *Bush v. Orleans School Board,* 194 F. Supp. 182, 185, affirmed *sub nom. Tugwell v. Bush,* 367 U.S. 907 [(1961)]; *Gremillion v. United States,* 368 U.S. 11 [(1961)].

*Dombrowski v. Pfister*, 380 U.S. at 487 (alterations added).

The Government's real and immediate threat of arrest is a deterrent meant to dissuade plaintiff from continuing to exercise his right to pursue the Civil Action. The threat that plaintiff will have to stand trial and face criminal charges punishable by up to twenty years in prison for exercising his First Amendment right to litigate his Civil Action is both terrifying and tyrannical.

As discussed below, prevailing case law and a federal statute are clear beyond doubt that plaintiff cannot be required to stand trial in a criminal action for exercising his right to sue.  "Because of the sensitive nature of constitutionally

protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights.  For free expression – of transcendent value to all society, and not merely to those exercising their rights – might be the loser." *Dombrowski v. Pfister*, 380 U.S. at 486.  "These [First Amendment] freedoms are delicate and vulnerable, as well as supremely precious in our society.  The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions."  *NAACP v. Button*, 371 U.S. at 433 (alteration added).

It is well-settled that equitable relief is the proper remedy for violations of First Amendment rights.  The Supreme Court made clear nearly one hundred years ago that "[a] federal injunction was available to prevent state officers from instituting criminal proceedings "under extraordinary circumstances where the danger of irreparable loss [of a constitutional right was] both great and immediate." *Fenner v. Boykin*, 271 U.S. 240 (1926).  Because the right to petition is one of our most precious rights, it has long since been settled that to flourish, rights need breathing room to survive and thrive and *any* unlawful encroachment operates to chill those rights.  The criminal indictment of a person precisely because he or she is a civil litigant is necessarily a profound infringement.

14

Historically, the Federal courts' refusal to enjoin *State* criminal cases derived from concerns over States' rights, federalism and comity. These concerns vanish when an injunction is sought to stop a federal prosecution and the abstention doctrine is not an impediment to granting relief in this case.

Federal prosecutors have unsuccessfully argued that a broad reading should be given to *Younger v. Harris*, 401 U.S. 37 (1971) and that restraints against federal courts enjoining ongoing criminal proceedings in State courts should be extended to federal cases. The Court of Appeals in *Juluke v. Hodel* completely rejected such an argument, stating:

> [a]pparently, the Government is seeking to extend the holding of *Younger v. Harris* – that a federal court will not enjoin an ongoing criminal proceeding in state court – to cover the situation in which parallel civil and criminal proceedings take place in federal court. Not only can we find no support for such an extension of *Younger,* but any such extension would be flatly at odds with the prevailing case law.

811 F. 2d 1553, 1556 (D.C. Cir.1987).

Other Courts have read *Juluke* as does plaintiff. "*Juluke* held that the Younger doctrine does not require federal courts to abstain or defer from granting injunctive relief pending resolution of parallel federal criminal actions implicating the First Amendment." *Christoforu v. United States*, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994).

15

Not only did the District Court have the authority to enjoin defendants from violating plaintiff's First Amendment right to access the courts, but this Court, it is respectfully submitted, has an obligation to do so to prevent the ongoing irreparable harm and injustice to plaintiff.

### ii.   Plaintiff's Right to Access the Courts is Protected by the First Amendment and Defendants Infringed That Right

The First Amendment mandates that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Constitution, Amend. I.  (SA-17).

According to the Supreme Court, "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."  *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983).

> 'It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances.  All these, though not identical, are inseparable.  They are cognate rights, ... and therefore are united in the First Article's assurance.'

*McDonald v. Smith*, 472 U.S. 479, 489-90 (1985) (quoting, *Thomas v. Collins*, 323 U.S. 516, 530 (1945)).

16

In 1907, the Supreme Court held, "[t]he right to sue and defend in the courts is the alternative of force.  In an organized society, it is the right conservative of all other rights, and lies at the foundation of orderly government.  It is one of the highest and most essential privileges of citizenship." *Chambers v. Baltimore & Ohio R. Co.*, 207 U.S. 142, 148 (1907).  In 2002, the Supreme Court reaffirmed *Chambers* and its progeny:

> We have recognized this right to petition as one of 'the most precious of the liberties safeguarded by the Bill of Rights,' *United Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217, 222 (1967), and have explained that the right is implied by 'the very idea of a government, republican in form,' *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L. Ed. 588 (1876).

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002).

The right to petition is not dependent upon success.  "Nor does the text of the First Amendment speak in terms of successful petitioning – it speaks simply of 'the right of the people . . . to petition the Government for a redress of grievances.'" *Id.* at 532.

### iii.   Plaintiff's Civil Action has Noerr-Pennington Immunity Because it is Not Objectively Baseless

The doctrine of Noerr-Pennington immunity derives from two Supreme Court cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 669

(1965). At its inception, the doctrine held that private persons were immune from liability under the antitrust laws for attempts to influence the passage or enforcement of laws, even if the laws for which they advocated would be anticompetitive. *Noerr,* at 135; *Pennington* at 670.

The doctrine now extends immunity to valid petitions to all departments of government for redress whether or not the injuries are caused by the act of petitioning or by government action which results from the petitioning, even if there is an improper purpose or motive. See, *Noerr, supra*; *Pennington, supra*; *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 509-11 (1972); *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 250 (3d Cir. 2001); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir.), cert. denied, 528 U.S. 871 (1999). "Under the Noerr-Pennington doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DirecTV, Inc.*, 437 F.3d 923, 928 (9th Cir. 2006).

Since its inception, the doctrine has continued to expand beyond antitrust and now confers immunity upon a variety of claims. However, the doctrine is not

limitless.  "[T]he Noerr-Pennington doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause."  *Id.* at 931.  On the other hand, neither the First Amendment's Petition Clause nor the Noerr-Pennington doctrine protects sham petitions.  *Id.*

The sham exception to the Noerr-Pennington doctrine holds that using the petitioning process simply as an anticompetitive tool without legitimately seeking a positive outcome from the petitioning destroys immunity.  See, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991).  However, the applicability of the sham litigation exception is subject to "the breathing space principle," which requires that "sham litigation" be both *objectively baseless and the product of an improper motive*.  See, *Sosa, supra*; *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 60-61 (1993).

Here, the Civil Action is not objectively baseless and cannot be considered sham litigation.  The Civil Action was ongoing from June 2010, until March 2014, with thousands of pages of expert reports prepared by both sides, detailing the scientific tests performed on the documents in question in order to determine their authenticity.  Every assertion of forgery relating to the authenticity of the Work for Hire Contract and emails made by the Zuckerberg and Facebook in the Civil

19

Action was countered by plaintiff's world-renowned experts. A summary of the

competing evidence that was presented to the District Court is found in the

"Dueling Expert Table." (A-111). The magnitude of the evidence was more than

the Magistrate was willing to consider when he rendered his R&R. In the R&R, in

which he recommended dismissal of the Civil Action, the Magistrate stated that,

because of the volume of evidence presented to him on the defendants' Motion to

Dismiss for Fraud Upon the Court or for Spoliation of Evidence, he _considered_

_only the evidence most favorable to the defendants_ and plaintiff's rebuttal

evidence, without taking plaintiff's allegations as true or considering the

affirmative evidence from plaintiff's experts that the Work for Hire Contract and

emails were authentic. This procedure had the effect of turning the burden of proof

applicable to motions to dismiss on its head and, instead of accepting plaintiff's

allegations as true and giving plaintiff the benefit of all favorable inferences, the

Court gave those benefits to the defendants, the moving parties.[3]/ Plaintiff filed

---

[3] The Magistrate's R&R is reported at _Ceglia v. Zuckerberg,_ 2013 U.S. Dist.
LEXIS 45500 (W.D.N.Y. March 26, 2013). At page *49-*50, the Magistrate
stated:

> Because copious evidence has been submitted by both Defendants in
> support of their challenge to the Work for Hire Document's authenticity ans
> [_sic_] by Plaintiff in opposition, including expert witness reports, affidavits,
> exhibits and deposition transcripts, a thorough discussion of all the evidence
> would be overwhelming to the reader and unnecessary. As such, _the court_
> _discusses only the evidence most favorable to Defendants' Motion to_
> _Dismiss_ and any relevant rebuttal evidence submitted by Plaintiff. [Emphasis

objections to the R&R (A-140), which the District Judge summarily rejected when he accepted the Magistrate's recommendation and ordered the case be dismissed. That decision is also on appeal to this Court in *Ceglia v. Zuckerberg,* No. 14-1365. The Magistrate's R&R was a far cry from his statement in court on June 30, 2011, when he questioned defendants' counsel in the Civil Action about his intention to file a Motion to Dismiss:

> I'm having difficulty understanding where we are going procedurally. Because from all the plaintiff has put in, it sure looks like they have no intention of throwing the towel in, that their experts are quite competent, if not equally competent or even more competent than your experts, ... .

A-132, T.30:5-9.

Further, when defendants' counsel stated that one of their experts was of the opinion that the Work for Hire Contract was a forgery, the Magistrate responded, "And, of course, they have an expert who I thought rather neatly rebutted that." (A-125, T.23:3-8).

Based upon the evidence before the Court, if it had applied the correct legal standard of review for dispositive motions, the defendants' Motion to Dismiss in the Civil Action would have been dismissed.  In any case, the quality and quantity

added.]

This error by the Magistrate is one of the primary bases for plaintiff's appeal of the District Court's decision in the related Civil Action.

of the evidence presented to the Court by plaintiff and his experts precluded any finding that could remotely lead to the conclusion that plaintiff's Civil Action was objectively baseless.

Obviously, the District Judge was heavily influenced in his decision to deny plaintiff's Motion for Preliminary Injunction and dismiss this injunction action by the Magistrate's R&R.  On March 27, 2013, he issued a Text Order in which he stated that, in connection with the injunction hearing, he would "give the parties time to consider and to address the consequences, if any, of the lengthy Report and Recommendation in *Ceglia v. Zuckerberg, et al.*, 10-CV-569-A, Dkt. No. 651, entered March 26, 2013, that recommends dismissal of that action ... ."  (A-4).

Although the District Court dismissed the injunction action based upon the R&R, the Magistrate did not make a finding of objective baselessness, even though he did not hesitate to assume the role of fact-finder.  The District Judge, on the other hand, although he found the action "to have been a sham," and denied plaintiff the benefit of Noerr-Pennington immunity, made no findings himself and based his decision vicariously on the Magistrate's R&R.   There was never a finding of objective baselessness that stripped plaintiff of the immunity he had when he brought and pursued the Civil Action.

22

### iv.   The Evidence in the Record of This Case Underscores the Fact that the Civil Action is *Not* Objecively Baseless

There are two central issues now at play in the two related lawsuits that are before this Court on appeal.  The first is whether the Civil Action was properly dismissed when the District Court considered defendants' most favorable evidence and whether the substantial, competent evidence presented by the plaintiff in that case was sufficient to raise genuine issues as to the authenticity of the Work for Hire Contract and the related emails upon which plaintiff relies.  The second is whether in *this* case, the evidence can possibly support the conclusion that the Civil Action is objectively baseless and, therefore, not subject to First Amendment protection.

Plaintiff respectfully submits that, even apart from the considerable evidence before the District Court in the Civil Action, the evidence entered in the record of this action required the conclusion that the Civil Action is not objectively baseless.

On January 2, 2014, Ceglia moved in this action to supplement the record with additional evidence.  (A-10, Doc. 61).  On January 22, 2014, the District Judge entered a Text Order (A-10, Doc. 66) permitting plaintiff to supplement the record with three expert reports, one from John W. Cawley, III, the Government's Forensic Document Examiner in the criminal case against Ceglia, the second from Katherine M. Koppenhaver, CDE, plaintiff's board certified forensic document

23

examiner, and the third from Joan M. Winkelman, also a board certified forensic document examiner for plaintiff.

### a.   The Report of the Government's Expert, John W. Cawley, III, Does *Not* Opine That the Work for Hire Document is Not Authentic

In the criminal action against Ceglia, the Government has produced a "Forensic Laboratory Examination Report" by John W. Cawley, III, a Forensic Document Examiner, Sr. for the U.S. Postal Service ("Cawley Report").  (A-339-340).

There is little to discuss about the Cawley Report, but what there is is momentous.

First, his report provides *no* support for the conclusion the Work for Hire Contract is not authentic.  His conclusion: "Due to the noted discrepancies, there are *indications* these pages *may* have come from multiple sources."  (A-340, emphases added). [4]/

In addition, this expert reported a most critical observation of the Work for Hire Contract that can only be explained if he was either grossly incompetent or corrupt.  He stated: "Based on visual and instrumental examinations, it was

---

[4] As discussed below, in relation to the Koppenhaver and Winkelman reports this is one of the weakest opinions a forensic document examiner can give and it cannot serve as the basis to establish a document's lack of authenticity.

24

determined no indented impressions were observed on Exhibits Q-1-1 and Q-1-2 [pages 1 and 2, respectively of the Work for Hire Contract]."  (A-339).[5]/

The Work for Hire Contract (A-245-246) contains on page 1, a handwritten interlineation ("Provided Web Designer is Finished by May 24, 2003").  This entry is followed by Ceglia's handwritten initials "PC" and Zuckerberg's handwriten initials "MZ."  If the interlineation appears as an indentation on the signed second page of the Work for Hire Contract, it would be strong evidence that the two pages were initialed and signed at the same time.  It is this handwritten interlineation which, Cawley determined did not appear as an indentation on page 2.  This conclusion is so preposterously and demonstrably false that one must question the competency or honesty of this supposed expert.  It was addressed in Ms. Koppenhaver's report.

### b.  Katherine Koppenhaver's Report Thoroughly Discredited the Cawley Report and Established the Work for Hire Contract as Authentic

As Ms. Koppenhaver explains in her report, she examined the same Work for Hire Contract at the U.S. Attorney's office in Manhattan on December 17,

---

[5] Zuckerberg admitted in the Civil Action that the signature on page 2 appears to be his and that page 2 appears to be consistent with the contract he admitted signing.  When asked by the Magistrate in the Civil Action if Zuckerberg "[said] at some point that the StreetFax contract is the correct contract," counsel responded, "He hasn't, but certainly that would be easy to do", and he was willing to "for sure."  (A-221, T.165:1-8).  He never has.

2003.  She attests that "[a]t the request of plaintiff's counsel I examined and

compared the two pages of the [Work for Hire] document to determine if it is an

intact document and whether it was altered or page substitutions have been made."

(A-358-359).  She "was also asked to examine Page 2 of the Work for Hire

document to determine if indentations appear on that page and, if so, if they

resulted from handwriting which appears on Page 1."  (A-359).

Contrary to the examination by Cawley's blind eye, Ms. Koppenhaver

swore:

> 5.    With respect to whether indentations appear on Page 2 of
> the Work for Hire Contract, I was able to observe the existence of
> indentations on Page 2 *with the naked eye*, without side-lighting or
> magnification.  It was determined that the handwritten words on Page
> 1 and the indentations on Page 2 were correctly aligned.  Based on my
> observations using side-lighting, *the indentations can be read* as
> 'Providing web designer is finished by May 24, 2003," which matches
> the hand-writing on Page 1.  See Exhibit B attached.  The initials 'PC'
> and 'MZ', also written on Page 1, were also indentifiable as correctly
> aligned indentations on Page 2.

(A-359, ¶ 5) (emphases added).

The photographic images of the initials on page 1 and the matching

indentations on page 2 appear as photographic images in her report.  *Id.* [6]/

---

[6] The initials on the first page appear to have holes in them.  That was caused by
the experts' extraction of ink from the initials for examination in the Civil Action.

Likewise, as she attested, the rest of the handwriting on page 1 appears as an exact indentation on page 2.  (A-367-368).

Ms. Koppenhaver also examined the staple holes on both pages of the Work for Hire Contract and found that "the document had been stapled only once and the staple had been removed.  This evidence supports the conclusion that another first page was never stapled to Page 2 and that Page 1 is the only first page that was attached to Page 2 and, therefore, Page 1 was not substituted for another page." (A-360, ¶ 6).

Finally, she concludes in ¶ 7:

> 7.     Based upon the comparisons made between Page 1 and Page 2 of the Work for Hire Contract, *it is my opinion to a reasonable degree of scientific certainty that the Work for Hire Contract is an unaltered document which does not contain substitutions.*

*Id.* (emphasis added).

She then explained that her "opinion is stated with the highest degree of confidence, at the 'identification' level, meaning a definite conclusion of identity." (A-360-361, ¶ 9).

Referring to Cawley's report, she stated that "although he, too, examined original documents, his opinion is rendered at the 'indications' level which, as the ASTM discussion notes state [A-370-372], is 'a very weak opinion,' not rising even to the level of 'probable.'" (A-361, ¶ 10).

### c.  Joan Winkelman's Report Established the Work for Hire Contract as Authentic

Joan M. Winkelman, also a board certified forensic document examiner, also submitted her report as a declaration in this case.  (A-373-401).

The majority of her work involves "determining the authenticity of handwriting including, but not limited to, signatures.  My training and experience include determining the authenticity of the various components of questioned documents, including, but not limited to, attributes such as fonts or type and formating used."  (A-374, ¶ 3).

Ms. Winkelman's assignment was "to determine indicators, if any, of authenticity in the 'Work for Hire agreement,' through the comparison of that document with the Street Fax document which is also described as the 'Kato-Street Fax document.'"  *Id.*, ¶ 4.[7]/  She, too, reviewed Cawley's report.  *Id.*, ¶ 5.

Ms. Winkelman discusses her findings upon examining images of the two documents.  She annexed to her declaration "a listing of [her] observations of the similarities and differences between the two documents that form the basis of [her] opinion."  *Id.,* ¶ 10.

---

[7] The Kato-Street Fax document is an authentic document which had been used by the plaintiff in 2003, about the same time the Work for Hire Contract was prepared and signed.

Her opinion:

> 9.     Based upon my examination and comparison of the two page Work for Hire agreement and the three page Kato-Street Fax document, both available in image form, *it is my opinion given to a reasonable degree of professional certainty*, that the similarities and differences identified in the two documents support the conclusion that *the Work for Hire agreement is authentic*.  This opinion is stated at the highly probable level of certainty due to the fact that the documents were available to me only in image form.

*Id.* (emphases added).

> Comparing her opinion with Cawley's she swore:

> My opinion is stated at the 'highly probable' level (described by ASTM as 'very persuasive') and not a higher level due to the fact that *I had to examine document images* rather than originals.  On the other hand, I have seen the Postal Service's Forensic Document Examiner's report of September 27, 2013, and although *he did examine original documents*, his opinion is rendered at the 'indications' level which, as the ASTM discussion notes state, is 'a very weak opinion,' which *does not rise even to the level of 'probable.'*

(A-375-376, ¶ 11) (emphases added).

This evidence was not countered by the defendants in this action, nor was it considered by the District Judge when he found plaintiff's Civil Action to be objectively baseless sham litigation based upon the Magistrate's R&R.  He then granted the defendants' Rule 12(b)(6) Motion to Dismiss.

In light of this evidence – which includes the Government's own expert's report, not to mention the wealth of evidence submitted by plaintiff in the Civil

Action – it cannot be said that plaintiff's Civil Action is objectively baseless and that he is not entitled to First Amendment protection which renders his criminal prosecution unconstitutional.

### v.   The District Court Erred When it Dismissed Plaintiff's Complaint Under Red. R. Civ. P. 12(b)(6)

As stated above, the District Judge dismissed the Civil Action by relying solely upon the R&R as the basis to grant the defendants' Rule 12(b)(6) Motion to Dismiss in this action.  (SA-12) ("Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), Dkt. No. 54, is hereby granted.").  He made no findings himself.

However, the Magistrate's patent error in granting Zuckerberg and Facebook's Motion to Dismiss the Civil Action after considering the *defendants' most favorable evidence*, is the subject of a separate appeal in this Court.[8]/  If the Magistrate's R&R is fatally flawed by reason of his incorrect analysis, then the District Judge could *not* conclude that the Civil Action was objectively baseless sham litigation and that plaintiff's pursuit of the Civil Action was not protected by the First Amendment's right to petition.

_____

[8]  For the reason that the Civil Action and this case are so intimately related and the District Court's decision in this case relied upon the R&R in the Civil Action, plaintiff will move to have both appeals consolidated.

30

## B.   A Strong Basis Exists for Issuing an Injunction to Halt the Prosecution of Plaintiff

In 2008, the Supreme Court acknowledged the four prong test a plaintiff

must meet before a preliminary injunction may issue.  To be successful, "[a]

plaintiff seeking a preliminary injunction must establish that [1] he is likely to

succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence

of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that

an injunction is in the public interest."  *Winter v. Natural Resources Defense*

*Council, Inc.*, 555 U.S. 7, 20 (2008) (citing, *Munaf v. Geren*, 553 U.S. 674,

689-690 (2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987);

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-312 (1982) (alterations

added).[9]/

"If the arguments for one factor are particularly strong, an injunction may

issue even if the arguments in other areas are rather weak."  *Cityfed Financial v.*

*Office of Thrift Supervision*, 58 F. 3d 738, 747 (D.C. Cir. 1995).

> [T]he [Second] Circuit has recently revisited the standard for injunctive
> relief in the context of an action for copyright infringement.  It concluded
> that its "longstanding standard … is inconsistent with the 'test historically

---

[9] This four prong test is ordinarily a matter for the Court's discretion.  But here, the judge made no findings and denied plaintiff's motion based upon the Magistrate's erroneous R&R.  His decision involved a misapplication of the law or was based upon mixed questions of law and fact.  In either case, his decision is subject to *de novo* review.  (See p. 11 above.)

31

employed by courts of equity' and has, therefore, been abrogated by *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)." See *Salinger v. Colting*, [607 F.3d 68 (2d Cir.] 2010). In *Salinger*, the court held that a preliminary injunction should issue upon a showing of a plaintiff's likelihood of success on the merits only where the plaintiff has also shown that: (1) "he  is likely to suffer irreparable injury in the absence of an injunction"; (2) "remedies at law, such as monetary damages, are inadequate to compensate for that injury"; (3) the balance of hardships tips in his favor; and (4) "the 'public interest would not be disserved' by the issuance of a preliminary injunction." [*Id.* at 77.] (citing *eBay*, 547 U.S. at 391). Although the *Salinger* court made clear that its holding was "limited to preliminary injunctions in the context of copyright cases," *the court also explained that it saw "no reason that eBay would not apply with equal force to an injunction in any type of case*." *Salinger*, [607 F.3d at 78] n.7.

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010) (emphasis added).

Where the District Court's decision denied plaintiff an injunction and dismissed the case on Rule 12(b)(6) grounds without having considered the evidence presented by the plaintiff or the dispositive arguments discussed below – which were essentially uncontroverted by the defendants – this Court must review the lower court's decision *de novo* and, it is respectfully submitted, reverse.

### i.   Plaintiff has a High Likelihood of Succeeding on the Merits

In the context of a motion for a preliminary injunction, "likelihood of success" means "a likelihood of success on the merits" of the underlying claim.

*Alliance For Open Soc'y Int'l Inc. v. United States Agency For Int'l Dev.*, 651 F.3d 218, 230 (2nd Cir. 2011).

The Supreme Court set out a standard from which the lower courts are to determine whether a statute is vague and possibly encroaches upon or chills First Amendment rights. The *Chevron* case instructs courts to determine whether a statute or its legislative history prohibits governmental conduct because Congress would not have sanctioned it. *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 845 (1984).

In this case, it is clear that Congress intended to immunize litigants from criminal prosecution resulting from their civil litigation documents, because there is a statute that speaks precisely to the issue.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*Id.* at 842-43.

33

Congress may make no law infringing a citizen's right to petition the government for redress of grievances.  The First Amendment forbids it.  (SA-17). "The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. at 138. Instead, Congress has codified a citizen's right to petition without fear of prosecution.

### a.   The Judicial Function Exception Immunizes Plaintiff from Prosecution for Filing and Serving Documents in the Civil Action

The legislative history of the judicial function exception (18 U.S.C. § 1001(b)) (SA-14) indicates that it was enacted by Congress in 1996 and added to 18 U.S.C. § 1001 for the purpose of codifying the exception which has long been recognized by many Federal courts as necessary to safeguard from the threat of prosecution statements made in the course of adversarial litigation.  Allowing the criminal penalties of § 1001 to apply to statements made in the course of adversarial litigation would chill vigorous advocacy and undermine the adversarial process.  *United States v. Vreeland*, 684 F. 3d 653, 665 (2012).

Plaintiff's prosecution for mail and wire fraud for having engaged in ordinary civil litigation activities is prohibited by statute because such conduct is

protected.  Title 18 U.S.C. § 1001, contains in subsection (b) what is often referred

to as the Adjudication or Judicial Function Exception, and it provides, in relevant

part as follows:

> § 1001.  Statements or entries generally
>
>> (a)    Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –
>>
>>> (1)    falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>>>
>>> (2)    makes any materially false, fictitious, or fraudulent statement or representation; or
>>>
>>> (3)    makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>>
>> shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331 [18 U.S.C.S. § 2331]), imprisoned not more than 8 years, or both.  ... .
>>
>> (b)    _Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate [United States magistrate judge] in that proceeding._

_Id._ (emphasis added).

The exception in subsection (b) has been repeatedly interpreted by the courts

to prohibit the very kind of prosecution with which plaintiff is now faced.

Section 1001(b) contains three requirements: a defendant "'must show that

(1) he was a party to a judicial proceeding, (2) his statements were submitted to a

judge or magistrate, and (3) his statements were made 'in that proceeding.'

[*United States v.*] *McNeil*, 362 F.3d [570,] 572 [(9th Cir. 2004)] (quoting 18 U.S.C.

§ 1001(b))." *United States v. Horvath*, 492 F.3d 1075, 1077 (9th Cir. 2007)

(alterations added].

> We need not, and do not, address the policy issues that inhere in the
> government's arguments.  Our only task is to understand what
> Congress meant when it chose to exempt from criminal liability
> certain kinds of lies to the federal government.  Under 18 U.S.C. §
> 1001(b), criminal liability does not attach to materially false
> statements submitted by a party to a judge in a judicial proceeding,
> even if the party makes the statements knowingly and willfully.

*Id.* at 1081.

> The legislative history of the judicial function exception indicates that it was
> enacted by Congress in 1996 and added to § 1001 for the purpose of

> > codify[ing] the judicial function exception which has long been
> > recognized by many Federal courts as necessary to safeguard from the
> > threat of prosecution statements made in the course of adversarial
> > litigation.  Allowing the criminal penalties of section 1001 to apply to
> > statements made in the course of adversarial litigation would chill
> > vigorous advocacy, thereby undermining the adversarial process.  The
> > exception is consistent with the [Supreme] Court's reasoning in
> > [*United States v. Bramblett*, 348 U.S. 503, 75 S. Ct. 504, 99 L. Ed.
> > 594 (1955), and *Morgan v. United States*, 309 F.2d 234, 114 U.S.
> > App. D.C. 13 (D.C. Cir. 1962)], and subsequent case law, which
> > consistently distinguished the adjudicative from the administrative
> > functions of the court, exempting from section 1001 only those
> > communications made to the court when it is acting in its adjudicative

36

> or judicial capacity, and leaving subject to section 1001 those
> representations made to the court when it is functioning in its
> administrative capacity.
>
> ***
>
> H. R. Rep. No. 104-680, 104th Cong., 2nd Sess. 1996, as reprinted, 1996
> U.S.C.C.A.N. 3935, 3937-38, 3943 (footnotes omitted) (emphasis added).

*United States v. Vreeland*, 684 F.3d 653, 665 (6th Cir. 2012) (alterations in

original).

The Second Circuit also considered the reach of the immunity exception in

*United States v. Masterpol*, 940 F.2d 760 (2d Cir. 1991):

> This Circuit has yet to consider directly the adjudicative function exception.
> In *United States v. D'Amato*, 507 F.2d 26 (2d Cir.1974), however, we faced
> an analogous question – whether section 1001 covered false statements
> made in the course of a civil suit.  There the defendant was prosecuted under
> section 1001 for submitting a false affidavit during a private civil action.
> We observed that section 1001 required 'a fraud upon the Government' or 'a
> deception upon an investigative or regulatory agency.' *Id.* at 28.  Because
> the government was not a party to the suit and because the false statement
> was not intended to further a fraudulent scheme against the government, we
> reversed the conviction.  We rejected the argument that 'a fraudulent
> statement in a court is ergo a 'fraud upon the Government.' *Id.*

*Masterpol*, 940 F.2d at 765.  "*D'Amato* specifically rejected the argument that the

submission of a false affidavit during a judicial proceeding before a federal court

thereby becomes a fraud within the jurisdiction of a department of the United

States." *Id.*

The defendants here cannot circumvent § 1001(b)'s immunity by "dressing up" their Indictment of plaintiff as mail and wire fraud, where otherwise protected litigation activity employed use of the mail and internet to file and serve litigation documents. "The exception ... was made sufficiently broad to cover not merely statements, but also 'representations, writings or documents' filed in court, since such filings 'are already covered by other statutes,' such as those prohibiting perjury and obstruction." *United States v. Butler*, 351 F. Supp. 2d 121, 131 (S.D.N.Y. 2004) (citation omitted).

The prosecution of plaintiff by the Government violates 18 U.S.C. § 1001(b) and must be halted.

### b.   As a Matter of Law, Plaintiff's Filing and Serving Papers Which Zuckerberg Swore He Knew to be False and Plaintiff's Engagement in the Ordinary Litigation Practices of Filing and Serving Those Papers, Cannot be the Subject of Prosecution for Mail and Wire Fraud Under Long-standing Precedent From the Federal Courts

The Indictment charges plaintiff with one count of mail fraud in violation of 18 U.S.C. § 1341, and one count of wire fraud in violation of 18 U.S.C. § 1343. Both counts rest on plaintiff's alleged "scheme to defraud Facebook, Inc., and Mark Zuckerberg and to corrupt the federal judicial process." (SA-2, ¶ 4). The particulars of the alleged scheme are that plaintiff "doctored or otherwise fraudulently converted a legitimate contract that he had with Mark Zuckerberg ...

38

to falsely make it appear as though he had entered into an agreement with Zuckerberg in which Zuckerberg agreed to provide CEGLIA with at least a 50% interest in Facebook" (SA-2-3, ¶ 5); and then filed and prosecuted a civil lawsuit against Zuckerberg and Facebook on the basis of the allegedly falsified contract and emails in *Ceglia v. Zuckerberg*, No., 1:10-cv-00569-RJA in the District Court for the Western District of New York.  (SA-3-5, ¶¶ 8-10).

Although plaintiff, of course, denied – and continues to deny – the charges, for purposes of his Motion for Preliminary Injunction, the truth or falsity of the charges was irrelevant, because the Government cannot prevail in any event.

As argued in the court below, another fatal problem with the criminal prosecution is that the Indictment is defective on its face and is insufficient to establish either mail or wire fraud in violation of federal law.  That is because a party who makes use of falsified matter in litigation, which the party knows the other side will know to be falsified, as the Government has alleged, cannot possess the intent necessary to formulate a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" within the meaning of the federal mail and wire fraud statutes under which plaintiff has been charged, 18 U.S.C. §§ 1341, 1343.

Here, the Government's Indictment rests on plaintiff's filing and prosecuting the Civil Action based upon an allegedly falsified Work for Hire Contract with Zuckerberg, which, if true, plaintiff necessarily knew that Zuckerberg would know to be falsified.  That being so, plaintiff could not, as a matter of law, have intended to obtain money or property from Zuckerberg under a scheme or artifice to defraud because plaintiff knew that Zuckerberg could not possibly be defrauded by an agreement and emails Zuckerberg knew to be false.  *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002).

Indeed, Zuckerberg has gone on record, under oath, claiming he knows the agreement with plaintiff to be falsified.  On June 2, 2011, well over a year before plaintiff's Indictment on November 26, 2012, Zuckerberg filed a declaration in the Civil Action in which he categorically stated, as "the Founder, Chairman, and Chief Executive Officer of Facebook, Inc.":

> 4.      I understand that Plaintiff Paul Ceglia alleges that Exhibit A [to the Amended Complaint in the Civil Case] is an agreement that entitles him to partial ownership of Facebook, and that he and I signed this document on April 28, 2003.

> 5.      I did not sign the document attached as Exhibit A to the Amended Complaint.

> ***

> 8.      The document attached as Exhibit A to the Amended Complaint is not the written contract that I signed.

40

\*\*\*

10.    I did not enter into any agreement, written or otherwise, ... with Ceglia concerning Facebook or any related social networking service or web site.

\*\*\*

14.    I did not write or receive any of the alleged e-mails quoted in the Amended Complaint.  [Doc. 46 in the Civil Action.]

(A-242-243).

Thus, if there was a scheme to defraud by plaintiff as claimed by the Government, both plaintiff and Zuckerberg knew that the documents relied on to perpetrate the scheme were false, and, more importantly, plaintiff knew that Zuckerberg would know the documents were false and he could not have intended or expected Zuckerberg to be defrauded into delivering property to plaintiff on the basis of documents Zuckerberg knew to be false.  The case law, hereafter discussed, is absolutely clear that under these circumstances the Government cannot establish wire or mail fraud.  Accordingly, the District Court erred when it refused to enter a preliminary injunction against the Government's continued prosecution of Ceglia in the criminal case.

This argument focuses on plaintiff's likelihood of success in demonstrating the insufficiency of the Indictment and the invalidity of the mail and wire fraud charges in the criminal case – a likelihood that rises to the level of a certainty under

the principles discussed above and the large and irrefutable body of supporting case law on which those principles rest.

The following facts were undisputed: (1) the charges of mail and wire fraud in the Indictment rest on allegations that plaintiff fabricated evidence (*i.e.*, a contract with Zuckerberg and emails between plaintiff and Zuckerberg related to the contract), and then he brought the Civil Action seeking relief against Zuckerberg and Facebook based on the allegedly fabricated evidence; (2) Zuckerberg knew the evidence to be fabricated, as he has testified; (3) at the time he allegedly fabricated the evidence of an agreement and emails between himself and Zuckerberg, plaintiff necessarily knew that Zuckerberg would know the evidence was fabricated; and (4) the mail and wire fraud allegedly committed by plaintiff consisted of using the mails and internet to transmit pleadings and other materials in the Civil Action.

Under a large and unrebutted line of cases, these facts fail to establish mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, respectively, as a matter of law. *United States v. Pendergraft*, 297 F.3d 1198, 1209 (11th Cir. 2002); *Sosa v. DirecTV, Inc.*, 437 F. 3d 923, 941 (9th Cir. 2006); *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 830-31 (M.D. La. 2002); *California Pharmacy Management v. Zenith Ins.*, 669 F. Supp. 2d 1152, 1161

42

(C.D. Cal. 2009); see also, *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 161-62 (D. Conn. 2000); *Warnock v. State Farm Mut. Auto. Ins. Co.*, 833 F. Supp. 2d 604, 609 (S.D. Miss. 2011); *Hallmark Cards, Inc. v. Monitor Clipper Partners*, 757 F. Supp. 2d 904, 914-15 (W.D. Mo. 2010); *Nolan v. Galaxy Scientific Corp.*, 269 F. Supp. 2d 635, 643 (E.D. Pa. 2003); *Curtis & Associates v. Law Offices of Bushman*, 758 F. Supp. 2d 153, 174-75 (E.D. N.Y. 2010), *aff'd* by Summary Order, 443 Fed. Appx. 582; 2011 U.S. App. LEXIS 20778 (2d Cir. 2011); *Talley v. Halpern*, 2005 U.S. Dist. LEXIS 17423, *10 (E.D. Pa. 2005); *Drobny v. JP Morgan Chase Bank, NA*, 929 F. Supp. 2d 839,  (N.D. Ill. 2013).

The leading case on this issue is *United States v. Pendergraft*, in which the 11th Circuit reversed convictions for mail fraud because "The allegations in the indictment for conspiracy to commit mail fraud and for the substantive offense of mail fraud ... fail[ed] to charge offenses as a matter of law."  297 F. 3d at 1209.

The Government charged the defendants with mail fraud based on their pursuing litigation in which they made use of an affidavit in which they falsely claimed to have been threatened by the adverse party.

The Court first observed, "*A number of courts have considered whether serving litigation documents by mail can constitute mail fraud, and all have rejected that possibility.*"  *Id.* at 1208 (emphasis added).  The Court noted that

"prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system." *Id.*

Instead of resting its decision on that ground, however, the Eleventh Circuit went to the language of the mail fraud statute itself, 18 U.S.C. § 1341, and determined that it could not reach a situation in which the charged party relied on falsified evidence that the party knew the adverse party would know was false.

> But, as always, we are primarily concerned with the language of the statute, not its policy implications.  While both the mail-fraud and wire-fraud statutes use the phrase "scheme to defraud," neither statute defines what a "scheme to defraud" is ... .  Instead, the meaning of "scheme to defraud" has been judicially defined ... .  Courts have defined the phrase broadly, allowing it to encompass deceptive schemes that do not fit the common-law definition of fraud ... .  Nevertheless, Congress did not strip the word "defraud" of all its meaning, ...; the word still signifies "the deprivation of something of value by trick, deceit, chicane, or overreaching."

*Pendergraft*, 297 at 1208-09 (citations omitted).

The Court then focused on the facts before it and found them not to constitute mail fraud as a matter of law:

> In support of their suit against Marion County, Pendergraft and Spielvogel authored affidavits that falsely accused Cretul of making threats. Such falsity might have deceived some, *but it could not deceive Marion County. Cretul, after all, was the Chairman of the Marion County Board of Commissioners*, and Pendergraft and Spielvogel were aware of Cretul's position.  *They knew that Cretul would deny making these threats, and they knew that their affidavits would not trick Cretul into admitting otherwise.  If they knew that they could not deceive Marion County, then they could not have had an intent to deceive.*  See *Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir.1991) ("A defendant cannot possibly intend to deceive someone if

44

he does not believe that his intended 'victim' will act on his deception."); *Norton v. United States*, 92 F.2d 753, 755 (9th Cir.1937) ("*There can be no intent to deceive where it is known to the party making the representations that no deception can result.*").

Since there was no intent to deceive, there was no "scheme to defraud," and we hold that Pendergraft and Spielvogel's mailing of litigation documents, even perjurious ones, did not violate the mail-fraud statute.

*Id.* at 1209 (emphases added).

The application of the *Pendergraft* decision to the facts of this case could not be clearer or more dispositive. As in *Pendergraft*, if plaintiff here forged the contract and emails between himself and Zuckerberg, as the Indictment alleges, he necessarily knew that this forged evidence "could not deceive" Zuckerberg and Facebook, of which Zuckerberg was "the Founder, Chairman, and Chief Executive Officer." Plaintiff knew, as in *Pendergraft*, that Zuckerberg and Facebook "would deny" the allegedly falsified evidence, and that the allegedly falsified evidence "would not trick" Zuckerberg and Facebook "into admitting otherwise."

Accordingly, as in *Pendergraft*, if plaintiff knew that he could not deceive Zuckerberg and Facebook, as he perforce did under the facts stated in the Indictment, plaintiff could not have had "the intent to deceive" required by the mail and wire fraud statutes as a matter of law. Since there could be no intent to deceive Zuckerberg and Facebook, there could be no "scheme to defraud" under sections 1341 and 1343, and the criminal case cannot possibly succeed. That being so,

45

plaintiff showed more than a likelihood, if not a certainty, of success on the merits in this case; there was no conceivable reason for allowing the criminal case to continue to chill plaintiff's First Amendment right to petition and the District Court erred when it ignored the law and refused to issue the preliminary injunction and instead dismissed the case.[10]/

Other courts have followed and adopted the reasoning of *Pendergraft.*  In *Sosa v. DirecTV, Inc.*, 437 F. 3d at 941, the Ninth Circuit rejected the proposition that mail or wire fraud could be based on forged letters known by the adverse party to be forged:  "Such letters cannot amount to mail fraud, however, where the sender knows the recipient will not be deceived by the falsehoods."

In *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, the District Judge in Louisiana followed *Pendergraft* and rejected RICO claims in which the alleged predicate acts were wire and mail fraud based on alleged misrepresentations that the adverse party knew to be false. Significantly, the Louisiana Court extended the analysis of *Pendergraft* by  specifically rejecting the

---

[10] Although plaintiff reasserts the authenticity of the documents upon which the Civil Action is based, the District Court's finding that they were fabrications was irrelevant to determining whether the injunction should have issued.  That the documents were found not to be authentic, and that Zuckerberg and Facebook knew as much, was all that was needed to invoke *Pendergraft* and halt the prosecution.  In other words, the dismissal of the Civil Action, rather than militating against issuing an injunction, was further cause to issue it.

claim that wire fraud or mail fraud can arise from trying to deceive the Court into ruling against the adverse parties:

> None of the Defendants sought to deceive Livingston Downs.  As in *Pendergraft*, *if the Defendants sought to deceive anyone, it was the courts and other government actors*.  Defendants allegedly presented the courts, the voters, and the Racing Commission with misleading information and baseless claims in the hope that they would be fooled into depriving Livingston Downs of the necessary legal backing to open their business or, at the very least, be fooled into delaying its entry into the market.  *Livingston Downs does not allege and presents no evidence that Defendants at any point sought to deceive it.  Without that intent to deceive, there can be no mail fraud violation*.

*Livingston Downs*, 257 F. Supp. 2d at 830-31 (emphases added.)

The Court concluded, "The import of the Eleventh Circuit's ruling is that one cannot commit fraud by fooling one person to receive something of value from another." *Id.* at 831.

To the same effect is *Drobny v. JP Morgan Chase Bank, NA*, in which the Court also dismissed RICO claims involving alleged mail fraud arising from the use of purportedly fraudulent documents in litigation, which could have deceived only the Court and not the adverse party against which relief was sought:

> Even assuming that Defendants knew that the foreclosure complaints were false, they would have intended to deceive the Lake County court, not Plaintiffs. This is insufficient under RICO because *one cannot commit mail or wire 'fraud by fooling one person to receive something of value from another.*' *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 830-31 (M.D. La. 2002) (citing *United States v. Pendergraft*, 297 F.3d 1198, 1208-09 (11th Cir. 2002).

47

*Drobny*, 929 F. Supp. 2d 839, 848-49 (emphasis added).

Similarly, in *California Pharmacy Management v. Zenith Ins.*, 669 F. Supp. 2d at 1161, the District Court for the Central District of California concluded that "an action for fraud cannot lie 'where the sender knows the recipient will not be deceived by the falsehoods,'" and rejected mail and wire fraud claims premised on alleged misrepresentations that the adverse party knew were false.

Finally, as the Eleventh Circuit noted in *Pendergraft*, there is a substantial body of case law that has "rejected the possibility" that "serving litigation documents by mail can constitute mail fraud." 297 F. 3d at 1208.  Indeed, this was the view of every court that had considered the issue at the time of *Pendergraft*, and numerous courts since *Pendergraft*.  *Daddona v. Gaudio*, 156 F. Supp. 2d at 161 ("Attempts to characterize abuse of process or malicious prosecution claims as mail and wire fraud violations for RICO purposes have been scrutinized by the courts, and have been rejected where the only allegedly fraudulent conduct relates to the filing of documents in litigation."); *Warnock v. State Farm Mut. Auto. Ins. Co.*, 833 F. Supp. 2d at 609 ("Because the evidence demonstrates only the transmittal of allegedly false litigation materials, this Court agrees that under *Pendergraft* and the related cases, Warnock has not proven the predicate acts of mail or wire fraud."); *Nolan v. Galaxy Scientific Corp.*, 269 F. Supp. 2d at 643

48

("This court is unwilling to expand RICO liability for mail fraud in such a dramatic fashion as to include litigation papers and pre-litigation statements of legal position."); *Curtis & Associates v. Law Offices of Bushman*, 758 F. Supp. 2d at 171 (dismissing claims where, "although plaintiffs have styled their allegations as mail and wire fraud, plaintiffs' allegations in fact focus entirely upon the 'litigation activities' involved in defendants' allegedly 'phony' and 'frivolous' litigation with plaintiffs."); *Hallmark Cards, Inc. v. Monitor Clipper Partners*, 757 F. Supp. 2d at 914-15; *Talley v. Halpern*, 2005 U.S. Dist. LEXIS 17423, *10. Plaintiff has found no case that holds otherwise.

This Court could, of course, follow the numerous decisions that hold that "litigation activities" – which are all that is challenged in the Indictment in the criminal case – cannot constitute mail or wire fraud. To do so would ensure the broadest possible protection for the First Amendment petitioning rights of plaintiff that have been placed in jeopardy by the criminal case. Or the Court could adopt the narrower rule of *Pendergraft*, that one cannot engage in a "scheme to defraud" knowing that the target of the alleged fraud cannot possibly be deceived – a rule that certainly fits the facts of this case. Whichever of the two rules the Court adopts, however, the result is the same: the Indictment in the criminal case is defective; the Government cannot possibly win the criminal case; and the

49

injunction which plaintiff sought below should issue because of plaintiff's

likelihood, if not certainty, of success on the merits and the irreparable harm to him

from the continuation of a baseless criminal prosecution.

### ii.   Plaintiff has Suffered Irreparable Harm and Lacks An Adequate Remedy at Law

"The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976).  The Second Circuit has weighed in on this question and held that "when

an alleged deprivation of a constitutional right is involved, most courts hold that no

further showing of irreparable injury is necessary." *Brewer v. West Irondequoit*

*Cent. School Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (citations and internal

quotation marks omitted).

> A criminal prosecution under a statute regulating expression usually
> involves imponderables and contingencies that themselves may inhibit the
> full exercise of First Amendment freedoms.  When the statutes also have an
> overbroad sweep, as is here alleged, the hazard of loss or substantial
> impairment of those precious rights may be critical.  For in such cases, the
> statutes lend themselves too readily to denial of those rights.  The
> assumption that defense of a criminal prosecution will generally assure
> ample vindication of constitutional rights is unfounded in such cases.

*Dombrowski v. Pfister,* 380 U.S. at 486.

Plaintiff has suffered and continues to suffer irreparable harm from the

chilling effect that the threat of looming and continued prosecution has had on his

willingness to pursue the adversarial Civil Action, including the appeal in this Court, which involves the same mail and internet activities for which he has already been indicted.

After filing the Civil Action and the court-ordered expert reports in furtherance of the litigation, plaintiff was arrested, his property seized and his liberty seriously impaired.  To secure his pre-trial release while the Criminal Case is pending, plaintiff had to post a financial bond, which includes virtually all his property, and he continues to endure draconian restrictions upon his liberty and freedom to travel.[11]/

Plaintiff clearly demonstrated that he has sustained – and continues to sustain – irreparable harm by reason of his arrest and the criminal charges unconstitutionally levied against him. The District Judge's bald statement that "The Court further declines to entertain plaintiff's request that the Court adjudicate his challenges to the criminal statutes in the indictment pending against him in the Southern District of New York because the Court finds he has an adequate remedy

---

[11] Consider that several weeks after plaintiff was released on bail, he was required to respond to the defendants' Motion to Dismiss in the Civil Action.  Plaintiff was justifiably afraid that by responding to the motion with additional litigation filings, he would have been at risk of further indictment and the forfeiture of all property pledged by him and his parents to secure the bond required for his bail.

51

at law in that District" (SA-12),  was patently erroneous given the deprivation of plaintiff's First Amendment right.

It is precisely because the loss of one's constitutional rights is irreparable that remedies at law, such as monetary damages, are inadequate to compensate for such injury, that injunctive relief is the only true remedy available.

### iii.   Balancing the Equities Strongly Favors Issuing an Injunction

The defendants will suffer no harm if an injunction issues.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor – indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States,* 295 U.S. 78, 88 (1935).

To halt a criminal prosecution which, under binding statutory and case law, is illegal on its face, cannot be said to be injurious to the defendants who, as Federal prosecutors, should be committed to the avoidance of unconstitutional prosecutions.  Given that the defendants have at their disposal other criminal statutes, "such as those prohibiting perjury and obstruction" (*United States v.*

*Butler*, 351 F. Supp. 2d at 131), the deliberate interference with plaintiff's pending Civil Action by indicting him for pursuing it, thereby chilling his First Amendment rights, clearly tips the scale heavily in his favor when balancing the equities.

### iv.   The Public Interest Will Not be Harmed by Issuing an Injunction, but Will be Significantly Benefited Thereby

Without an injunction to stop the defendants' violation of plaintiff's right to petition, every person in America who files a civil action in State or Federal court will be faced with the prospect of Federal criminal prosecution each time he or she mails or transmits over the internet litigation documents which the U.S. Attorney considers to be fraudulent.  Does the adjudication of a civil action which turns upon the authenticity of a piece of evidence place a losing party at risk of criminal prosecution for mail or wire fraud?  The answer, plaintiff respectfully submits, is obvious; it does not and should not.  Otherwise, the harm to the public interest would be insidious by reason of the damage certain to be visited on First Amendment rights.

"By permitting determination of the invalidity of these statutes without regard to the permissibility of some regulation on the facts of particular cases, we have, in effect, avoided making vindication of freedom of expression await the outcome of protracted litigation. ... .  The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the

53

prospects of its success or failure." *Dombrowski v. Pfister*, 380 U.S. at 487

(citation omitted).

"These freedoms are delicate and vulnerable, as well as supremely precious

in our society. The threat of sanctions may deter their exercise almost as potently

as the actual application of sanctions." *NAACP v. Button*, 371 U.S. at 433. "It is in

the *manifest interest of the public* that a federal governmental agency be enjoined

from acting unlawfully." *Clarke v. Office of Fed. House. Enter. Oversight*, 355 F.

Supp. 2d 56, 66 (D.D.C. 2004) (noting a "substantial public interest" in ensuring

that a federal agency "acts within the limits of its authority"); *Mova Pharm. Corp.*

*v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir.1998) (affirming a preliminary

injunction based in part on the public interest in the faithful execution of the laws);

*Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) (approving the

district court's conclusion that the "public interest is always served when public

officials act within the bounds of the law and respect the rights of the citizens they

serve.").

Moreover, the A.B.A.'s Model Code of Professional Responsibility explains

the rationale behind Rule 7-105(A):

> The civil adjudicative process is primarily designed for the settlement of
> disputes between parties, while the criminal process is designed for the
> protection of society as a whole. Threatening to use, or using, the criminal
> process to coerce adjustment of private civil claims or controversies is a

subversion of that process; further, the person against whom the criminal process is so misused may be deterred from asserting his legal rights and thus the usefulness of civil process in settling private disputes is impaired. As in all cases of abuse of judicial process, the improper use of criminal process tends to diminish public confidence in our legal system.

Congress and the Courts have carefully balanced the policies underlying the criminal laws with the penalties for their violation. "[O]ne consideration of policy overshadowed all others during the years when perjury first emerged as a common-law offense: "that the measures taken against the offense must not be so severe as to discourage witnesses from appearing or testifying." *Bronston v. United States*, 409 U.S. 352, 359 (1973). Allowing prosecutors to use the broad mail or wire fraud statutes to prosecute what is otherwise the commission of perjury, for example, would upset the careful balance now in place. With the mail and wire fraud statute's twenty year maximum penalties, there can be little doubt that effectively quadrupling the penalty for perjury would discourage witnesses from testifying fully and openly.

Plaintiff demonstrated in the lower court and in the above arguments that: (1) he has a substantial likelihood of success on the merits; (2) he has suffered and will continue to suffer irreparable harm in the absence of an injunction; (3) he has no adequate remedy at law for the defenddants' violation of his rights; (4) the equities are in his favor and defendants cannot show that they would suffer any

55

harm if an injunction issues; and (4) the public interest strongly favors issuance of an injunction.

## CONCLUSION

On the basis of the foregoing arguments and authorities plaintiff respectfully requests that this Court reverse the District Court's Order dismissing his case and denying plaintiff a preliminary injunction, and that this Court order that an injunction issue permanently enjoining the defendants from proceeding with the pending prosecution of plaintiff for mail and wire fraud.

Respectfully submitted,

By:    s/   Gil D. Messina
Gil D. Messina
Joseph M. Alioto
Attorneys for Plaintiff/Appellant
Paul D. Ceglia

Dated:   September 2, 2014
Colts Neck, NJ

56

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,260 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Word Perfect X7 in New Roman, 14 point font size.


Dated:   September 2, 2014          s/ Gil D. Messina_____
                                    Gil D. Messina,

# No. 14-1752
## *Ceglia v. Holder et al.*
# Special Appendix Table of Contents

Indictment (Filed November 26, 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SA-1

District Court Order Dismissing Case (March 25, 2014). . . . . . . . . . . . . . . .   SA-10

Judgment  of the United States District Court, Western District of
    New York (May 25, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SA-13

Adjudication Immunity Statute (18 U.S.C. § 1001). . . . . . . . . . . . . . . . . . . .   SA-14

Mail Fraud Statute (18 U.S.C. § 1341). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SA-15

Wire Fraud Statute (18 U.S.C. § 1343). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SA-16

First Amendment to Constitution of United States.. . . . . . . . . . . . . . . . . . . .   SA-17

Seventh Amendment to Constitution of United States. . . . . . . . . . . . . . . . . .   SA-18

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 2 6 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :

         - v. -             :         INDICTMENT

PAUL CEGLIA,                :         12 CRIM 876

              Defendant.    :

- - - - - - - - - - - - - - - - x

COUNT ONE
(Mail Fraud)

The Grand Jury charges:

Introduction

1.    At all times relevant to this Indictment, Facebook,

Inc. was, and remains to this day, an Internet corporation that

runs the social networking website, Facebook.  Facebook was

founded by Mark Zuckerberg ("Zuckerberg") together with his

college roommates and fellow Harvard University students,

Eduardo Saverin, Dustin Moskovitz, and Chris Hughes.  Facebook

officially launched at Harvard in the afternoon of on or about

February 4, 2004.  At that time, the website was available on

the Internet at the domain name, "thefacebook.com," but its

membership was limited to Harvard students and only accessible

by those with a Harvard e-mail address.  Over time, the

website's membership expanded to other colleges in the Boston

JUDGE CARTER

SA-1

area, the Ivy League, and Stanford University before it
eventually was made available to anyone aged 13 and over.
As of November 2012, Facebook, Inc. reported that its website
has over one billion active users.

2.    Since in or about July 2004, Mark Zuckerberg has
served as the Chief Executive Officer and a member of the board
of directors of Facebook, Inc.  Beginning in or about January
2012, Zuckerberg also became chairman of the board of directors
of Facebook, Inc.

3.    On or about May 18, 2012, Facebook, Inc. held an
initial public offering.  Mark Zuckerberg's personal interest in
Facebook is presently considered to be worth billions of
dollars.

### The Scheme to Defraud

4.    From at least in or about June 2010, up to and
including in or about October 2012, PAUL CEGLIA, the defendant,
engaged in a multi-billion dollar scheme to defraud Facebook,
Inc. and Mark Zuckerberg and to corrupt the federal judicial
process.

5.    In furtherance of the scheme to defraud, PAUL CEGLIA,
the defendant, doctored or otherwise fraudulently converted a
legitimate contract that he had with Mark Zuckerberg, dated
April 28, 2003 -- in which Zuckerberg agreed to perform certain

SA-2

programming work for CEGLIA wholly unrelated to the Facebook website, in exchange for an agreed upon fee -- to falsely make it appear as though he had entered into an agreement with Zuckerberg in which Zuckerberg agreed to provide CEGLIA with at least a 50% interest in Facebook.

6.    As a further part of the scheme to defraud, on or about June 30, 2010, PAUL CEGLIA, the defendant, filed a civil lawsuit in the Supreme Court for the State of New York, Allegany County, against Mark Zuckerberg and Facebook, Inc., which was thereafter removed to the United States District Court for the Western District of New York, to falsely and fraudulently allege his ownership interest in Facebook.

7.    As a further part of the scheme to defraud, PAUL CEGLIA, the defendant, manufactured evidence, including purported e-mails with Mark Zuckerberg, to support his false and fraudulent lawsuit and also destroyed evidence that was inconsistent with that lawsuit's false claim.

### Statutory Allegations

8.    From at least in or about June 2010, up to and including in or about October 2012, in the Southern District of New York and elsewhere, PAUL CEGLIA, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by

SA-3

means of false and fraudulent pretenses, representations and
promises, for the purpose of executing such scheme and artifice
and attempting so to do, did place and caused to be placed in a
post office and authorized depository for mail matter, matters
and things to be sent and delivered by the Postal Service, and
did deposit and cause to be deposited matters and things to be
sent and delivered by private and commercial interstate
carriers, and did take and receive and cause to be taken and
received therefrom, such matters and things, and did cause to be
delivered by mail and such carriers, according to the direction
thereon, such matters and things, to wit, CEGLIA filed a civil
lawsuit against Facebook, Inc. and that company's founder and
Chief Executive Officer, Mark Zuckerberg, fraudulently demanding
a significant ownership stake in Facebook, Inc., and caused
legal pleadings and other items to be delivered by mail to
Washington, D.C., among other places, from the Southern District
of New York and elsewhere, including on or about April 11, 2011.

(Title 18, United States Code, Sections 1341 and 2.)

### COUNT TWO
(Wire Fraud)

The Grand Jury further charges:

9.   The allegations contained in paragraphs 1 through 7
above are hereby repeated, realleged, and incorporated by
reference as if fully set forth herein.

4

10.   From at least in or about June 2010, up to and
including in or about October 2012, in the Southern District of
New York and elsewhere, PAUL CEGLIA, the defendant, willfully
and knowingly, having devised and intending to devise a scheme
and artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, did transmit and cause to be transmitted by means of
wire communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, CEGLIA filed a civil
lawsuit against Facebook, Inc. and that company's founder and
Chief Executive Officer, Mark Zuckerberg, fraudulently demanding
a significant ownership stake in Facebook, Inc., and caused
others to send interstate electronic communications in
connection with that lawsuit, including on or about July 14,
2011, November 1, 2011, and December 8, 2011.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION AS TO COUNT ONE

11.   As a result of committing the offense alleged in Count
One of this Indictment, PAUL CEGLIA, the defendant, shall
forfeit to the United States pursuant to Title 18, United States
Code, Section 981(a)(1)(C) and Title 28, United States Code,
Section 2461(c), any property constituting or derived from

5

SA-5

proceeds obtained directly or indirectly as a result of the mail
fraud offense alleged in Count One of this Indictment, and any
property traceable to such property.

### Substitute Asset Provision

12.   If any of the above-described forfeitable property, as
a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due
diligence;

b.   has been transferred or sold to, or deposited
with, a third person;

c.   has been placed beyond the jurisdiction of the
Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), to seek forfeiture of any
other property of PAUL CEGLIA, the defendant, up to the value of
the above forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 28,
United States Code, Section 2461(c), Title 18, United States
Code, Section 1341, and Title 21, United States Code, Section
853.)

## FORFEITURE ALLEGATION AS TO COUNT TWO

13.   As a result of committing the offense alleged in Count Two of this Indictment, PAUL CEGLIA, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the wire fraud offense alleged in Count Two of this Indictment, and any property traceable to such property.

### Substitute Asset Provision

14.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, pursuant to Title 21, United States Code,

7

SA-7

Section 853(p), to seek forfeiture of any other property of PAUL

CEGLIA, the defendant, up to the value of the above forfeitable

property.

> (Title 18, United States Code, Section 982(a)(2)(A);
> and Title 21, United States Code, Section 853.)

FOREPERSON

PREET BHARARA
United States Attorney

B

SA-8

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### PAUL CEGLIA,

Defendant.

### INDICTMENT

12 Cr.

(18 U.S.C. §§ 1341, 1343 and 2.)

*PREET BHARARA*
United States Attorney.

**A TRUE BILL**

Foreperson.

11/26/12   FILED INDICTMENT   CASE ASSIGNED TO J.CARTER.

CATT USMT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PAUL D. CEGLIA,

                  Plaintiff,

              v.

ERIC HIMPTON HOLDER, JR.,
individually and as Attorney General
of the United States,

PREETINDER S. BHARARA,
individually and as U.S. Attorney for
the Southern District of New York,

JANIS M. ECHENBERG, individually
and in capacity as representative of
the U.S. Attorney's Office for the
Southern District of New York,

CHRISTOPHER D. FRYE, individually
and in capacity as representative of the
U.S. Attorney's Office for the Southern
District of New York,

                  Defendants.

**ORDER**
13-CV-256-A

      The plaintiff in this action, Paul D. Ceglia, seeks declaratory and injunctive

relief against the United States Attorney General, the U.S. Attorney for the Southern

District of New York, and two Assistant U.S. Attorneys for the Southern District of

New York.  Plaintiff Ceglia asks this Court to enjoin defendants from prosecuting an

indicted criminal case pending against plaintiff in the Southern District of New York,

and to enjoin defendants from any further criminal investigation or prosecution of

plaintiff for conduct arising out of a civil action he brought in this Court claiming an ownership interest in Facebook, Inc., the large social networking website. *See Ceglia v. Facebook, Inc.*, 10-CV-569-A (W.D.N.Y.). Plaintiff alleges he is entitled to declaratory and injunctive relief against defendant prosecutors based upon an immunity afforded plaintiff primarily by the Petition Clause of the First Amendment of the United States Constitution. Dkt. No. 50.

Plaintiff Ceglia is currently charged in an Indictment pending in the United States District Court for the Southern District of New York with mail fraud and wire fraud. *See* Dkt. No. 50, Ex. A (Indictment in *United States v. Ceglia*, 12 Cr. 876 (ALC) (S.D.N.Y.)). He is charged with participating in a scheme to defraud Facebook, Inc., and Mark Elliot Zuckerberg, and to corrupt the federal judicial process, arising from conduct relating to his allegations in the civil case in this Court alleging that he is entitled to a multi-billion dollar ownership interest in Facebook, Inc. *Id.* Plaintiff faces one count of executing a mail fraud scheme and one count of executing a wire fraud scheme in violation of 18 U.S.C. §§ 1341 and 1343, respectively. *Id.*

This Court has entered an Order dismissing plaintiff Ceglia's related civil action, *Ceglia v. Facebook, Inc.*, pursuant to the Court's inherent power based upon a finding by a standard of clear and convincing evidence that the purported contract upon which that action is predicated is a fabrication and that plaintiff knows it. *See* Dkt. No. 673 in 10-CV-569-A (W.D.N.Y.). For the reasons stated in the thorough Report and Recommendation the Court adopted in support of the inherent-powers

2

SA-11

dismissal of the *Ceglia v. Facebook, Inc.,* action, the Court finds that action to have been a sham. *See* Dkt. No. 673 in 10-CV-569-A (W.D.N.Y.). As a consequence, the Court finds the claims in this action, in which plaintiff Ceglia seeks immunity for conduct related to that action on the basis of his First Amendment and Seventh Amendment rights, and the *Noerr-Pennington*[1] doctrine, to be without merit. *See Plumley v. Massachusetts,* 155 U.S. 461, 479 (1894) ("The constitution of the United States does not secure to any one the privilege of defrauding the public."); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60 (1993)). The Court further declines to entertain plaintiff's request that the Court adjudicate his challenges to the criminal statutes in the indictment pending against him in the Southern District of New York because the Court finds he has adequate remedies at law in that District. Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), Dkt. No. 54, is therefore granted. The Clerk shall enter Judgment for defendants and terminate the action.

        **SO ORDERED.**

                            ___*Richard J. Arcara*_____
                            HONORABLE RICHARD J. ARCARA
                            UNITED STATES DISTRICT COURT

Dated:   March 25, 2014

---

[1] *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 135–38 (1961) (establishing antitrust immunity for petitions to state legislature); *see also United Mine Workers of America v. Pennington,* 381 U.S. 657, 670 (1965) (extended *Noerr* immunity to petitions of public officials); *and California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972) (extended *Noerr-Pennington* immunity to right of access to courts).

3

SA-12

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court

WESTERN DISTRICT OF NEW YORK

Paul D. Ceglia,

    v.

Eric Himpton Holder, Jr.,
as Attorney General of the United States, et al.

**JUDGMENT IN A CIVIL CASE**
CASE NUMBER: 1:13-CV-256A

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is granted and this case is closed.

Date: March 26, 2014

MICHAEL J. ROEMER, CLERK

By:   s/Deborah M. Zeeb
      Deputy Clerk

SA-13

# ADJUDICATION IMMUNITY STATUTE
## 18 U.S.C. § 1001

§ 1001.  Statements or entries generally

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331 [18 USCS § 2331]), imprisoned not more than 8 years, or both.  ... .

(b) Subsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate [United States magistrate judge] in that proceeding.

# MAIL FRAUD STATUTE
## 18 U.S.C. § 1341

§ 1341.  Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. ... .

SA-15

**WIRE FRAUD STATUTE**
**18 U.S.C. § 1343**

§ 1343.  Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. ... .

## FIRST AMENDMENT TO THE
## <u>CONSTITUTION OF THE UNITED STATES</u>

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

## SEVENTH AMENDMENT TO THE
## CONSTITUTION OF THE UNITED STATES

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.