**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

—————————————————————————
PAUL D. CEGLIA,                           :
                                          :
              Plaintiff-Appellant,        :        Docket No. 14-1365
                                          :
       v.                                 :
                                          :
MARK ELLIOT ZUCKERBERG, et al.,           :
                                          :
              Defendants-Appellees.       :
————————————————————————          :

————————————————————————          :
                                          :
PAUL D. CEGLIA,                           :
                                          :
              Plaintiff-Appellant,        :        Docket No. 14-1752
                                          :
       v.                                 :
                                          :
ERIC H. HOLDER, JR., as Attorney          :
General of the United States, et al.,     :
                                          :
              Defendants-Appellees.       :
—————————————————————————         :


ON APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
—————————————————————————————————————

**APPELLANT'S RESPONSE TO ORDER TO SHOW CAUSE
(DOCUMENT 128) AND REQUEST FOR ARGUMENT**
—————————————————————————————————————

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

FACTS IN SUPPORT OF APPELLANT'S RESPONSE
    TO ORDER TO SHOW CAUSE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL ARGUMENT IN RESPONSE TO ORDER TO SHOW CAUSE. . . . . . 15

    I.  The Fugitive Disentitlement Rule May Not be Invoked in
        This Case to Dismiss Ceglia's Civil Appeals.. . . . . . . . . . . . . . . . . 15

    II.  Federal Rule of Appellate Procedure 47 Does Not Permit
         Invoking the Drastic Remedy of Disentitlement in This Case.. . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

REQUEST FOR ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITES

<u>Cases</u>

*Blackmer v. United States*, 284 U.S. 421 (1932). . . . . . . . . . . . . . . . . . . . . . . . 20

*Degen v. United States*, 517 U.S. 820 (1996). . . . . . . . . . . . . . . . . . . . 16, 19, 20, 21

*Empire Blue Cross & Blue Shield v. Finkelstein*,
    111 F.3d 278 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Esposito v. I.N.S.*, 987 F.2d 108 (2d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 15, 23

*Facebook, Inc., et al v. DLA Piper LLP (US), et al,*
    Index No. 653183/2014 (Sup. Ct. N.Y. County). . . . . . . . . . . . . . . . . . . . 13

*Hovey v. Elliott*, 167 U.S. 409 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McVeigh v. United States*, 11 Wall. 259, 78 U.S. 259 (1871). . . . . . . . . . . . . . . 20

*Ortega-Rodriguez v. United States*, 507 U.S. 234 (1993). . . . . . . 16, 17, 18, 19, 22

*Thomas v. Arn*, 474 U.S. 140 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Anagnos*, 853 F.2d 1 (1st Cir. 1988). . . . . . . . . . . . . . . . . . . . . 17

*United States v. Eng*, 951 F.2d 461 (2d Cir. 1991). . . . . . . . . . . . . . . . . . . . . 15, 16

*United States v. Holmes*, 680 F.2d 1372 (11th Cir. 1982). . . . . . . . . . . . . . . . . 17

*United States v. Pendergraft,* 297 F.3d 1198 (11th Cir. 2002). . . . . . . . . . . . . . . 13

United States Mine Workers v. Pennington, 381 U.S. 657 (1965). . . . . . . . . . . . 13

ii

*Wu v. Holder,* 617 F.3d 97 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wu v. Holder*, 646 F.3d 133 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rules

Federal Rule of Appellate Procedure 47. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

N.Y. Rule 1.16(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

N.Y. Rule 1.16(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statutes

28 U.S.C. § 2072. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Appellant, Paul Ceglia, submits this, his response, to the Court's Order to Show Cause dated March 12, 2015 (Document 128).

## FACTS IN SUPPORT OF APPELLANT'S RESPONSE TO ORDER TO SHOW CAUSE

Paul Ceglia, his wife, two young sons and their family dog are missing. Based upon two recent news reports from which one cannot definitively conclude that Mr. Ceglia is a fugitive from justice, this Court issued, *sua sponte*, an Order to Show Cause why Mr. Ceglia's pending appeals from two *civil* judgments entered by the District Court in the Western District of New York should not be dismissed because of his recent disappearance and non-appearance in the *criminal* case in the Southern District of New York.

Mr. Ceglia was criminally charged on October 25, 2012, in the Southern District of New York for wire and mail fraud because he filed and pursued a civil action for breach of a written contract against Facebook, Inc. and Mark Zuckerberg in the Western District of New York. ("*Facebook* Action" or, in this Court, "*Facebook* Appeal"). The criminal prosecution was commenced while the *Facebook* Action was pending and it was brought in a district distant from where that civil case was being litigated. The criminal prosecution was instigated, it is believed, by Zuckerberg and Facebook because of the incestuous relationship

1

between their attorneys and the U.S. Attorney for the Southern District of New York, Preetinder "Preet" Bharara, who was formerly with the law firm representing Zuckerberg and Facebook in these civil appeals.[1] At the time Ceglia was arrested, the U.S. Attorney made extrajudicial comments stating, "Dressing up a fraud as a lawsuit does not immunize you from prosecution." [2]

The extraordinary timing of the indictment of Mr. Ceglia – while the Facebook Action was pending – was intended to chill his First Amendment right to pursue the *Facebook* Action. In fact, the government alluded to the fact that further court filings by Ceglia's lawyers in the *Facebook* Action could result in further charges being brought against him *and his lawyers*. (*Holder* Appeal, Trans. of Hearing (May 10, 2013) A-290-96 (T.16:20-22:6).[3] The indictment, we submit, was also calculated to prejudice the Magistrate Judge who would ultimately grant Facebook's and Zuckerberg's Motion to Dismiss the *Facebook* Action as a fraud on the court, and the District Judge, who accepted the Report and

---

[1] http://www.justice.gov/usao/nys/meetattorney.html

[2] http://dealbook.nytimes.com/2012/10/26/man-claiming-facebook-ownership-arrested-on-fraud-charges/

[3] This transcript is from the *Ceglia v. Holder* civil action, which was brought by Ceglia to enjoin the criminal prosecution ("*Holder* Action"). The appeal from the denial of the injunction is the related appeal in this Court. ("*Holder* Appeal")

2

Recommendation without addressing any of the substantial objections raised by Ceglia.

The scheme did not succeed in deterring Ceglia from proceeding with the *Facebook* Action, but it did succeed in causing his lead counsel to move to be relieved on October 30, 2012, because, as the Magistrate Judge stated in his Order of March 20, 2013, the attorney was said to "fear for his safety" and because of "threats ... made against him" (*Facebook* Action, Doc. 649, p.9), even though the attorney "states his continued belief that Plaintiff has, in bringing and prosecuting this action, not committed fraud, a factor which could justify withdrawal under N.Y. Rule 1.16(c)(2), (3)." *Id.* at p.6.[4]/

The District Court in Buffalo denied Ceglia meaningful discovery from Facebook and Zuckerberg and denied Ceglia the opportunity to depose Zuckerberg in both the *Facebook* and *Holder* Actions. Zuckerberg has never denied under oath that the signature and initials on the original Work for Hire Contract – or so-called Facebook Contract – are his. Instead, the Magistrate Judge granted Zuckerberg's and Facebook's motion to dismiss the *Facebook* Action as a fraud after considering only the evidence most favorable to Facebook and Zuckerberg and Ceglia's rebuttal evidence. *Facebook* Appeal SA-36 (Report and

---

[4] The Magistrate Judge denied counsel's motion to be relieved.

Recommendation) ("the court discusses only the evidence most favorable to Defendants' Motion to Dismiss and any relevant rebuttal evidence submitted by Plaintiff").  However, Ceglia's evidence supporting the authenticity of the Work for Hire Contract is so overwhelming that the Magistrate's decision to consider the evidence most favorable to Facebook and Zuckerberg is erroneous on its face.

As discussed below, the decision whether to dismiss an appeal under the fugitive disentitlement rule is an equitable decision informed by several factors, including the strength of the merits of the appeal and the importance of the issues involved.  Ceglia's evidence that was disregarded by the trial court, although the Magistrate and District Judge were required to take it as true and view it in the light most favorable to Mr. Ceglia, follows:

**Larry Stewart:**  Larry Stewart is the Chief Forensic Scientist and President of Stewart Forensic Consultants, LLC and the former director of the U.S. Secret Service's Forensic Laboratory.   His findings and conclusions are:

- after thorough and exhaustive forensic testing of the Work for Hire Contract there is no indication to suggest that Contract is anything other than genuine.

- there is no evidence to support the conclusion the Work for Hire Contract was altered.

- the yellow discoloration evident in the Work for Hire Contract was the result of repeated exposure of the document to high intensity and/or

4

UV lights and that based upon videotapes made of the examinations by experts in the underlying civil litigation, the Work for Hire Contract yellowed dramatically between the time the document was provided to Facebook's and Zuckerberg's experts and when it was made available to Ceglia's experts.

- the toner found on page 1 of the Work for Hire Contract matches that found on page 2 and chemical and physical testing failed to detect any differences between toner samples.

*Facebook* Appeal, A-1096-1467.

**James Blanco:**  Mr. Blanco is a Forensic Document Examiner/Examiner of Questioned Documents.  His findings and conclusions are:

- the Work for Hire Contract is an authentic, unaltered document.

- there is no support for the theory of a page 1 substitution, forgery or fraud as alleged by Zuckerberg and the Government.

- the signature, "Mark Zuckerberg" and the initials "MZ" represent the natural, normal and genuine handwriting characteristics of Mark Zuckerberg as demonstrated by known specimen samples.

- page 1 of the Work for Hire Contract was originally executed together with page 2 as a companion document.

- page 1 of the Work for Hire Contract was on top of page 2 when the hand-printed interlineation with the handwritten initials "PC" and "MZ" were written on page 1.

- staple holes and secondary staple hole impressions/detent marks on page 1 of the Work for Hire Contract match and align with the staple holes and secondary staple hole impressions/detent marks on page 2 of the Work for Hire Contract, demonstrating that the two pages of

the Contract were stapled only one time, when they were stapled to each other.

- differences in fonts between pages 1 and 2 of the Work for Hire Contract are a common occurrence when creating documents by means of "cutting and pasting" from other source documents.

- there is an absence of perceivable difference in edge definition in the print between pages 1 and 2 of the Work for Hire Contract.

- the initials "PC", found as a latent writing indentation on page 2 of the original Work for Hire Contract, match the position of the written "PC" initials on page 1 of the original Work for Hire Contract and do not match the position of the initials "PC" on the tiff image of page 1 of the Street Fax document.

- the word "is" appears as a visible, handwritten interlineation on page 1 of the Work for Hire Contract and also appears as a latent handwritten impression on page 2 of the Work for Hire Contract, but the same word does not appear in the interlineation on the Street Fax document which contains the word "has" instead.

- the Street Fax document exists only as two computer image ("tiff") files and an original of that document has not been produced for analysis.

- page 1 of the Street Fax document was not the original companion page attached to page 2 of the Work for Hire Contract.

- the hand-printed interlineation observed on page 1 of the Street Fax tiff image was not the source of the latent indent image on page 2 of the Work for Hire Contract because the positions of the interlineation and indent images do not match.

- Facebook's and Zuckerberg's experts repeatedly exposed the Work for Hire Contract to UV light as well as other damaging light sources.

6

- the Work for Hire Contract was repeatedly tested on a Foster and Freeman Electrostatic Detection Apparatus ("ESDA") machine by Facebook's and Zuckerberg's expert and his assistant and the documents were subjected to excessive exposure and processing by Facebook's and Zuckerberg's experts.

- the front sides of page 1 and page 2 of the Work for Hire Contract were deteriorated or "yellowed," as the result of Facebook's and Zuckerberg's experts' excessive processing, exposure and mishandling of the documents.

- column measurements on the two pages of the Street Fax document are substantially different from one another.

*Facebook* Appeal A-1583-2071.

**Katherine Koppenhaver:**  Ms. Koppenhaver is a Certified Forensic

Document Examiner.[5]/  Her findings and conclusions are:

- the Work for Hire Contract is an  unaltered document which does not contain substitutions.

- indentations appear on page 2 of the Work for Hire Contract, which were visible to the naked eye, without side-lighting or magnification.

- the handwritten words on page 1 and the indentations on page 2 were correctly aligned and the words, which were visible on both pages, matched each other.

- the initials "PC"and "MZ", written on page 1, were also correctly aligned with the indentations on page 2.

---

[5] Ms. Koppenhaver's report was filed in the District Court in the *Holder* Action.

7

- the staple holes on both pages of the Work for Hire Contract show the document was stapled only once and that the staple had been removed, supporting the conclusion that another first page was never stapled to page 2 of the Work for Hire Contract, that page 1 is the only first page that was attached to page 2, and that page 1 was not substituted for another page.

*Holder* Appeal A-358-72.

**Joan M. Winkelman:**  Ms. Winkelman is a Board Certified Forensic Document Examiner.  She undertook to determine indicators of authenticity in the Work for Hire Contract by comparing that document with a document described as the "Kato-Street Fax document" (not to be confused with the Street Fax tiff computer image).[6]/  Her findings and conclusions are:

- an examination and comparison of images of the two-page Work for Hire Contract and the three-page Kato-Street Fax document, led her to the conclusion that, based upon the similarities and differences identified in the two documents, the Work for Hire Contract is authentic.

*Holder* Appeal A-373-401.

**Walter Rantanen:**  Mr. Rantanen is an expert in fiber identification relating to paper.  He is an expert used by the U.S. Secret Service to match papers by

---

[6] It is not disputed that the Kato-Street Fax document is an authentic document which was used by Mr. Ceglia in 2003, about the time the Work for Hire Contract was prepared and signed by him and Mr. Zuckerberg.  Ms. Winkelman also submitted her report in the *Holder* Action.

identifying fiber content.  His findings and conclusions are:

- paper samples taken from pages 1 and 2 of the Work for Hire Contract are consistent with having come from the same paper mill and production run.

*Facebook* Appeal A-1532-1536.

**Michael Pliszka:**  Mr. Pliszka is an expert polygraph examiner certified in Polygraph Science (Forensic Psychophysiology), a full member of the American Polygraph Association and American Association of Police Polygraphists.  He has received a certification of specialized training from the American Polygraph Association.

He conducted a polygraph examination of Paul Ceglia on June 11, 2011.  The examination paid particular attention to the authenticity of the Work For Hire Contract between Paul Ceglia and Mark Zuckerberg dated April 28, 2003.  The questions asked during the polygraph examination were designed to determine whether Mr. Ceglia had forged or doctored the Work for Hire Contract.  His findings and conclusions are:

- after conducting three polygraph charts utilizing a Zone Comparison Technique, and review of the examination utilizing accepted criteria for analysis, the examination results were properly classified as "No Deception Indicated," which is indicative of an individual telling the truth.

*Facebook* Appeal A-240-52.

9

**Jerry Grant:** Mr. Grant is a Certified Access Data Forensic Examiner with more than 25 years of professional computer forensic expert and systems analysis experience. He is currently a Computer Forensic Investigator for the Western District of New York Federal Public Defender's Office. He performs forensic investigations on electronic evidence involved in Federal criminal cases. His findings and conclusions are:

- on March 31, 2011, he received 41 floppy disks containing Mr. Ceglia's e-mails and on Friday, April 1, 2011, he created forensically sound, bit by bit, images of each disk for analysis and then performed an initial review of relevant disks to determine the dates and times the various documents on the disks were created utilizing 19 discrete, forensically relevant methods.

- all data on the floppy disks show that all products and versions were commercially available during the relevant 2003-2004 time period.

- no evidence was found that would indicate fraud.

*Facebook* Appeal A-540-48.

**John Paul Osborn:** Mr. Osborn is a Forensic Document Examiner.

He examined the Work For Hire Contract between Paul Ceglia and Mark Zuckerberg. His findings and conclusions are:

- section 3 on the first page of the Work for Hire Contract has interlineations with the handwritten initials "PC" and "MZ" next to the interlineations.

10

- the second page has two handwritten signatures and hand-printed dates to the right of each signature.

- all of the handwriting and hand-printing on the two pages of the Work for Hire Contract are original writing ink on paper entries.

- page 2 of the Work for Hire Contract bears indentations caused by the interlineations and handwritten initials on the first page of the Contract.

- the only indentations on the second page of the Contract match, and were caused by, the interlineations and initials on the first page of the Work for Hire Contract.

- the second page of the Work for Hire Contract was underneath page 1 of the Work for Hire Contract when the interlineations and handwritten initials were made on page 1.

*Facebook* Appeal A-221-39.

**Neil Broom:**  Neil Broom, is an expert in the fields of Computer Forensics,

Network and Computer Security, Information Assistance and Professional Security

Testing.  His findings and conclusions are:

- there was an insufficient basis from which Facebook's and Zuckerberg's experts could draw reliable conclusions about fraudulent activity by Mr. Ceglia.

- so-called "anomalies" associated with Mr. Ceglia's electronic media and the documents found on the media are not reliable evidence of fraud.

- his analysis considered the lack of information regarding the "pedigree" of the evidence, the compromised nature of the electronic media due to the presence of many malware items and viruses, Mr.

11

Zuckerberg's noted reputation as a computer hacker and his ability to remotely access the so-called "Ceglia media" and plant images thereon, including apparent emails which he could then remotely transmit from the compromised computer, the highly unusual circumstance of the Street Fax images being two of only *five* "sent" items found on the computer of Ceglia's mother, Vera Ceglia, the illegible nature of the Street Fax tiff images when the supposed intention was to create a document that could be read, the explanation of so-called anomalies regarding dates, time stamps, formatting differences, the unreliability of information relating to the supposed re-installation of operating systems, the misidentification of the location where the Street Fax images were found and the unreliability of conclusions drawn by Facebook's and Zuckerberg's experts due to their lack of sufficient information and data.

*Facebook* Appeal A-1468-1513.

**Valery N. Aginsky, Ph.D.:**  Dr. Aginsky is a Forensic Chemist / Ink and Document Dating Specialist.  His findings and conclusions are:

• ink tests performed on relevant documents case by experts disclosed by the government and experts retained by Facebook and Zuckerberg in the underlying *Facebook* Action (upon which the government has chosen to rely in the criminal case), are invalid based upon the limitations of current science and the lack of adequate information.

*Facebook* Appeal A-261-75.

Mr. Ceglia brought the *Holder* Action in the Western District of New York, seeking to enjoin the criminal prosecution in the Southern District of New York on the grounds it was brought to interfere with the *Facebook* Action in the Western District and calculated to chill the exercise of his First Amendment right to proceed

12

with that case by threatening him and his lawyers with future prosecution if they

did.[7]/ Mr. Ceglia submits that criminally prosecuting him for having filed a civil

action for breach of contract is a violation of his First Amendment right, a violation

of his *Noerr-Pennington* immunity, and a violation of the widely accepted doctrine

enunciated in *United States v. Pendergraft,* 297 F.3d 1198, 1209 (11th Cir. 2002)*,*

which prohibits federal prosecutions for wire and mail fraud in precisely the

circumstances alleged in Ceglia's indictment).[8]/  If Mr. Ceglia did willingly flee the

jurisdiction, it was after the District Court denied his motion to dismiss the

indictment for failure to allege a crime under *Pendergraft* and after the Court denied

his motion to dismiss on First Amendment grounds under *Noerr-Pennington*,

which affords him immunity from having to stand trial because his evidence in the

---

[7] It is noteworthy that, consistent with their scorched earth policy, Facebook and Zuckerberg have now brought suit for malicious prosecution in the New York Supreme Court against Ceglia's former lawyers in the *Facebook* Action, DLA Piper, LLP (US), Milberg, LLP, Lippes Mathias Wexler Friedman LLP, Paul Argentieri & Associates and nine individual lawyers from those firms who worked on that case.  *Facebook, Inc., et al v. DLA Piper LLP (US), et al*, Index No. 653183/2014 (Sup. Ct. N.Y. County).

[8] We do not expound upon those arguments here.  They are argued in appellant's briefs in both the *Zuckerberg* and *Holder* Appeals and are mentioned here as support for the conclusion that the civil appeals are meritorious.  The *Noerr-Pennington* Doctrine derives from *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) and their progeny.

*Facebook* Action, some of which is mentioned above, shows that his lawsuit was not objectively baseless.

These events in the *Facebook* and *Holder* Actions and in the criminal case were disillusioning and discouraging to Ceglia and may well have led him to despair of ever receiving a fair and impartial hearing in the courts. This, we acknowledge, is not an excuse if he did decide to flee with his family, but it is an explanation which this Court can take into account when it decides whether to dismiss the pending *civil* appeals which are separate from the pending *criminal* case. As discussed below, the Supreme Court has held that in a case such as this, the fugitive disentitlement doctrine should not be invoked in order to dismiss a civil appeal.

Finally, there is no factual basis for the Court to definitively conclude from the two news reports referred to in the Order to Show Cause that Mr. Ceglia is a fugitive. He and his family are missing. His lawyers have not heard from them and they do not know where they are. One of the news articles cited by in the Order to Show Cause states, "It is unclear why [Ceglia] removed the monitoring device from his ankle." This appears to be what "a law enforcement official said Monday," according to the report.

14

It would be premature and fundamentally unfair to dismiss Mr. Ceglia's civil appeals when it is not clear that his disappearance was willful and that he is indeed a fugitive.[9]/ The law discussed below supports the conclusion that Ceglia's civil appeals should not be dismissed.

## LEGAL ARGUMENT IN RESPONSE TO ORDER TO SHOW CAUSE

### I.  The Fugitive Disentitlement Rule May Not be Invoked in This Case to Dismiss Ceglia's Civil Appeals

In the Order to Show Cause, this Court cited *Esposito v. I.N.S.*, 987 F.2d 108, 110 (2d Cir. 1993) for the proposition that it has "authority to dismiss a civil appeal when our jurisdiction is invoked by a fugitive from justice."  Apart from the fact that a factual determination has yet to be made that Ceglia is a "fugitive," the *Esposito* court acknowledged the basic rule that the fugitive disentitlement doctrine "is invoked at our discretion ... and we do not find sufficient reason to apply it in the present case." *Id.* (*citing*, *United States v. Eng*, 951 F.2d 461, 464-67 (2d Cir. 1991)).

In *Eng*, this Court observed that the Supreme Court had not extended the disentitlement doctrine to civil matters relating to a criminal fugitive, although the

---

[9] A person who purposely leaves the jurisdiction or decides not to return to it, in order to avoid prosecution, is a fugitive. *United States v. Eng*, 951 F.2d 461, 464  (2d Cir. 1991).

Second Circuit and some others had. *Id.* at 465. Those cases applying the

doctrine to civil matters appear to be primarily civil *forfeiture* and *in rem* actions

which were related to fugitivity. *Id.* (and cases cited). More importantly, *Esposito*

and *Eng* both pre-date the Supreme Court's decisions in *Ortega-Rodriguez v.*

*United States*, 507 U.S. 234 (1993) and *Degen v. United States*, 517 U.S. 820

(1996).

In *Ortega-Rodriguez*, the Supreme Court held that the fugitive disentitlement

rule would not bar a convicted former fugitive from appealing his sentence because,

while a case is pending before a District Court, the District Court is well situated to

impose an appropriate punishment, including a separate sentence for flight, that

adequately vindicates the public interest in deterring escape and safeguards the

District Court's dignity. *Ortega-Rodriguez,* 507 U.S. at 247-48. Because Ceglia's

disappearance from the criminal proceeding does not affect or disrupt the

proceedings in the Court of Appeals it does not operate to disqualify his civil

appeals because the "additional trouble" caused by his disappearance redounds not

to the appeals court, but to the District Court. *Id.* at 245. The civil appeals are

fully briefed and arguments are scheduled for April 16, 2015. They may proceed in

his absence without delay or inconvenience to the Court or the appellees.

The Supreme Court did not question that "an appellate court may employ

dismissal as a sanction when a defendant's flight operates as an affront to the

dignity of the court's proceedings." *Id.* at 246. However, if Ceglia has fled, he has

> flouted the authority of the District Court, not the Court of Appeals. ...
> . [I]t is the District Court that has the authority to defend its own
> dignity, by sanctioning an act of defiance that occurred solely within
> its domain. *See, United States v. Anagnos*, 853 F.2d 1, 2 (1st Cir.
> 1988) (declining to follow [*United States v.*] *Holmes*, [680 F.2d 1372
> (11th Cir. 1982), *cert. denied,* 460 U.S. 1015 (1983)] because former
> fugitive's "misconduct was in the district court, and should affect
> consequences in that court, not in ours").

*Id.*

> The Supreme Court held:

> We cannot accept an expansion of this reasoning that would
> allow an appellate court to sanction by dismissal any conduct that
> exhibited disrespect for any aspect of the judicial system, even where
> such conduct has no connection to the course of appellate
> proceedings.

*Id.*

> While an appellate court has access only to the blunderbuss of
> dismissal, the district court can tailor a more finely calibrated
> response. Most obviously, because flight is a separate offense
> punishable under the Criminal Code, ... the district court can impose a
> separate sentence that adequately vindicates the public interest in
> deterring escape and safeguards the dignity of the court.

*Id.* at 247-48.

The *Facebook* and *Holder* Appeals, which were filed and fully briefed many

months before Ceglia disappeared, are unrelated to the conduct of the criminal trial

17

and if dismissed now, they will be forever barred. [10]/

The Supreme Court has also held that appeals premised on the alleged insufficiency of the evidence should not be dismissed under the fugitive disentitlement rule because retrial is not permitted in the event of reversal in that class of appeals and there would not be prejudice to the government resulting from the defendant's absence. *Id.* at 249. The same is true here. Ceglia's *Holder* Appeal seeks to enjoin his prosecution on First Amendment grounds, under *Noerr-Pennington* and because, under the *Pendergraft* case, the indictment cannot state a crime as a matter of law. If Ceglia prevails in that appeal he will not have to face trial for wire and mail fraud. In that sense, his appeal is no different than one brought by a fugitive for insufficiency of the evidence and it should be allowed to proceed.

Another concern of the Supreme Court is whether, if the criminal appeal is allowed to proceed in a fugitive's absence, it will frustrate the ability to enforce the

---

[10] In the civil appeals, Ceglia has shown by uncontroverted evidence that it is Zuckerberg and Facebook who deliberately misled the District Court by first claiming the Work for Hire Contract was a page one forgery and that the second page was authentic. Ceglia was charged criminally based upon Zuckerberg's statements to the authorities. See *Holder* Appeal (Verified Criminal Complaint) ¶ 5, A-347-48. When this was disproven by Ceglia's experts in the *Facebook* Action, Zuckerberg and Facebook changed their story to a two page forgery which is inconsistent with both their earlier theory and Zuckerberg's statements to government investigators. See *Facebook* Appeal, Appellant's Br. 25-31.

appeals court's decision.  That is also not a concern here.  If the appeals court

grants Ceglia's appeal of the denial of the injunction in the *Holder* Action on First

Amendment and/or *Pendergraft* grounds, its decision will be fully enforceable

because the criminal case will be dismissed.  If Ceglia's *Facebook* Appeal

succeeds, enforceability will not be an issue because the civil case will be

reinstated.  If the appeals fail, the District Courts dismissal orders will stand and be

enforceable.  For these reasons, lack of enforceability is not a reason to prohibit the

civil appeals from proceeding.

　　Under these circumstances, this Court should not dismiss the civil appeals

because doing so would "rest on nothing more than the faulty premise that any act

of judicial defiance, whether or not it affects the appellate process, is punishable by

appellate dismissal."  *Ortega-Rodriguez*, 507 U.S. at 250.

　　In *Degen v. United States*, 517 U.S. 820 (1996), unanimously decided, the

Supreme Court reversed the Ninth Circuit's invocation of the fugitive

disentitlement rule in a civil forfeiture action that arose out of a criminal prosecution

from which Degen was a fugitive.  The Supreme Court held that imposition of the

disentitlement rule and prohibiting the fugitive from defending  in the civil forfeiture

action "would be an arbitrary response to the conduct it [the disentitlement rule] is

supposed to redress or discourage."  *Id.* at 828.  As is the case here, the Supreme

19

Court reasoned that in the civil action, any decision by the lower court would not
be frustrated by the defendant's absence. With respect to the other purposes of
the disentitlement doctrine: the need to "redress the indignity visited upon the
District Court" by the defendant's absence and "the need to deter flight from
criminal prosecution, the Court held that "[b]oth interests are substantial, but
disentitlement is too blunt an instrument for advancing them." *Id.*

> The right of a citizen to defend his property against attack in a
> court is corollary to the plaintiff's right to sue there. *McVeigh v.
> United States*, 11 Wall.[259,] 267[, 78 U.S. 259 (1871)]. For this
> reason we have held it unconstitutional to use disentitlement similar to
> this as punishment for rebellion against the United States, *ibid.*, or, in
> at least one instance, for contempt of court, *Hovey v. Elliott*, 167 U.S.
> 409, 413-414, 42 L. Ed. 215, 17 S. Ct. 841 (1897). We need not, and
> do not, intimate a view on whether enforcement of a disentitlement rule
> under proper authority would violate due process, *cf. Blackmer v.
> United States*, 284 U.S. 421, 76 L. Ed. 375, 52 S. Ct. 252 (1932). It
> remains the case, however, that the sanction of disentitlement is most
> severe and so could disserve the dignitary purposes for which it is
> invoked. The dignity of a court derives from the respect accorded its
> judgments. That respect is eroded, not enhanced, by too free a
> recourse to rules foreclosing consideration of claims on the merits.

This Court has noted that "'once a court has determined that a party is a
fugitive from justice, the decision on whether to dismiss the appeal should be
informed by the reasons for the doctrine and the equities of the case.'" *Wu v.
Holder*, 646 F.3d 133, 135 (2d Cir. 2011) (quoting *Wu v. Holder,* 617 F.3d 97, 100
(2d Cir. 2010), in which the Court declined to invoke the fugitive disentitlement

20

doctrine).

Consistent with the Supreme Court's decisions in *Ortega-Rodriguez* and *Degen*, this Court identified four purposes for the disentitlement rule: 1) assuring the enforceability of any decision that may be rendered against the fugitive; 2) imposing a penalty for flouting the judicial process; 3) discouraging flights from justice and promoting the efficient operation of the courts; and 4) avoiding prejudice to the other side caused by the defendant's escape. *Id.* (*citing Empire Blue Cross & Blue Shield v. Finkelstein*, 111 F.3d 278, 280 (2d Cir. 1997) and *Degen*, 517 U.S. at 824). This Court has also considered whether the party provides an explanation for his fugitive status, the extent to which a party has truly evaded the law, and the merits of the appeal. *Id.* at 135-36. The first four factors have been shown not to be sufficiently implicated by Ceglia's absence as to warrant dismissing his appeals, nor do the other considerations militate in favor of disentitlement under *Degen*.[11]/

## II. Federal Rule of Appellate Procedure 47 Does Not Permit Invoking the Drastic Remedy of Disentitlement in This Case

---

[11] When it denied disentitlement in *Wu,* this Court was also influenced by the fact that months rather than years had passed since the petitioner failed to appear. *Id.* at 136. Here, Ceglia is reported to gone missing only 12 days ago.

In *Ortega-Rodriguez* the Supreme Court appears to suggest that the promulgation of a rule which extends the fugitive disentitlement doctrine in the manner suggested by the Order to Show Cause must meet the requirements of F.R.A.P. 47, which has not occurred in this circuit.

> Our review of rules adopted by the courts of appeals in their supervisory capacity is limited in scope, but it does demand that such rules represent reasoned exercises of the courts' authority. *See Thomas v. Arn*, 474 U.S. 140, 146-148, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985). Accordingly, *the justifications we have advanced for allowing appellate courts to dismiss pending fugitive appeals all assume some connection between a defendant's fugitive status and the appellate process*, sufficient to make an appellate sanction a reasonable response.

*Ortega-Rodriguez*, 507 U.S. at 244 (emphasis added).

> The above quote from the Court is followed by footnote 15:

> The reasonableness standard of *Thomas v. Arn*, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985), is not, however, the only reason we require some connection between the appellate process and an appellate sanction. As the dissent notes, *post*, at 254, n. 2, *Federal Rule of Appellate Procedure 47, which authorizes the promulgation of rules by the courts of appeals, limits that authority to rules "governing [the] practice" before those courts.*

*Id.* n.15 (emphasis added).

F.R.A.P. 47 requires the affirmative adoption of a local rule permitting the dismissal of a fugitive's appeal:

Rule 47. Local Rules by Courts of Appeals

22

(a)  Local Rules.

(1)  Each court of appeals acting by a majority of its judges in regular active service may, after giving appropriate public notice and opportunity for comment, make and amend rules governing its practice. A generally applicable direction to parties or lawyers regarding practice before a court must be in a local rule rather than an internal operating procedure or standing order.  A local rule must be consistent with -- but not duplicative of -- Acts of Congress and rules adopted under 28 U.S.C. § 2072 and must conform to any uniform numbering system prescribed by the Judicial Conference of the United States.  Each circuit clerk must send the Administrative Office of the United States Courts a copy of each local rule and internal operating procedure when it is promulgated or amended.

(2)  A local rule imposing a requirement of form must not be enforced in a manner that causes a party to lose rights because of a nonwillful failure to comply with the requirement.

(b)  Procedure When There Is No Controlling Law.  A court of appeals may regulate practice in a particular case in any manner consistent with federal law, these rules, and local rules of the circuit.  No sanction or other disadvantage may be imposed for noncompliance with any requirement not in federal law, federal rules, or the local circuit rules unless the alleged violator has been furnished in the particular case with actual notice of the requirement.

It appears that the Second Circuit has not promulgated a local fugitive

disentitlement rule that would extend to the dismissal of Ceglia's civil appeals.

*Esposito v. INS*, 987 F.2d 108 (2d Cir. 1993), the decision cited in the Court's

Order to Show Cause, and which predates *Ortega-Rodriguez* and *Degen*, is not

authority to dismiss on such grounds.  Thus, the application of the fugitive

disentitlement doctrine to the *Facebook* and *Holder* Appeals is not permitted under

23

the precedents set by the Supreme Court or by other duly adopted rule.

## CONCLUSION

The appellant respectfully submits that the *Facebook* and *Holder* Appeals

may not be dismissed on fugitive disentitlement grounds.

Respectfully submitted,

Dated:  March 20, 2015          s/ Gil D. Messina_____
       Holmdel, NJ                Gil D. Messina

Joseph M. Alioto                Gil D. Messina
Alioto Law Firm                 Messina Law Firm, P.C.
35th Floor                      961 Holmdel Road
1 Sansome Street                Holmdel, NJ 07733
San Francisco, CA 94014         (732) 332-9300
(415) 434-8900

                    *Attorneys for Plaintiff-Appellant,*
                    *Paul D. Ceglia*

## REQUEST FOR ARGUMENT

The appellant respectfully requests that the Court grant the parties argument

on the Order to Show Cause.

s/ Gil D. Messina_____

24